## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| HD SUPPLY CONSTRUCTION SUPPLY, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.: 1:19-cv-02750-LMM |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| REEF R. MOWERS, | ) | |
| WASHOUTPAN.COM, LLC | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

COMES NOW, HD SUPPLY CONSTRUCTION SUPPLY, LTD., Plaintiff in the above-entitled action (hereinafter "Plaintiff"), and herewith files this FIRST AMENDED COMPLAINT for damages against REEF R. MOWERS ("Mowers") and the company he owns, WASHOUTPAN.COM, LLC ("WP") (collectively "Defendants") and shows this Honorable Court as follows:

### A. NATURE OF THE COMPLAINT

1.

This action results from Defendants' multiple schemes to destroy Plaintiff's reputation and business through malicious fabrication and dissemination of false information and defamatory commercial statements against Plaintiff with the intent to injure it in a pattern of illegal activity under both Georgia and Federal RICO

statutes which included acts of extortion, wire fraud, false advertising and even the impersonation of an OSHA inspector.  As Defendants sell a product which competes with Plaintiff, these illegal and anti-competitive actions were taken for the purpose of damaging Plaintiff's business relationships and reputation and to usurp market interest and opportunity for Defendants' own financial gain. Consequently, Plaintiff is forced to file the instant complaint for the resulting damages and to obtain an injunction to restrain Defendants from continuing such malicious behavior to remedy this gross injustice.

## B. PARTIES, JURISDICTION AND VENUE

2.

Plaintiff is a limited partnership organized and existing under the laws of the State of Florida, with its headquarters and principle place of business located at 3400 Cumberland Blvd., Atlanta, Georgia, 30339.

3.

Plaintiff's indirect parent company is HD Supply, Inc., incorporated and existing under the laws of the State of Delaware, with its headquarters and principle place of business located at 3400 Cumberland Blvd., Atlanta, Georgia 30339.  None of Plaintiff's general or limited partners is a resident of the State of California.

4.

Plaintiff is a well-respected industrial products distributor in North America that regularly engages in interstate commerce and provides a broad range of products and value-added services to professional customers.

5.

Reef R. Mowers ("Mowers") is a resident of San Diego, California.

6.

Washoutpan.com, LLC ("WP") is a limited liability company organized and existing under the laws of the State of California with its principal place of business located at 5330 Alta Bahia Court, San Diego, California 92109.  Mowers is the owner of WP and its agent for service of process.

7.

Plaintiff is informed and therefore believes that Mowers is WP's sole member.

8.

For all of Mowers' behavior and actions described in this Complaint, Mowers was an agent of WP acting within the scope of his authority as WP's owner and in his capacity as WP's owner and sole, controlling member.

9.

WP is an importer of pop-up containment products ("pop-up products") and industrial washout pans ("pans") used to receive and contain liquid concrete waste from concrete pumps and ready mix trucks.

10.

This action arises under 15 U.S.C. § 1125(a) and the statutory and common laws of the State of Georgia. This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1331 (federal question), 15 U.S.C. § 1121 (Lanham Act claims), 28 U.S.C. §1367 (supplemental jurisdiction) and 28 U.S.C. § 1332 (diversity) because there is diversity of citizenship and the amount in controversy exceeds $75,000.00.

11.

This Court has personal jurisdiction over Defendants because Defendants have purposefully availed themselves of the privileges and benefits of the laws and marketplace of the State of Georgia by, among other things, having continuous and systematic contacts with the State, regularly transacting business within the State, regularly soliciting business in the State, deriving substantial revenue from goods sold and delivered to the State, and due to the fact that conduct giving rise to this Complaint was directed at the State of Georgia.

12.

Defendants began soliciting business from Plaintiff, which is headquartered in the State of Georgia, which involved Defendants engaging in discussions with Plaintiff's employees in Atlanta, Georgia beginning in approximately October 2012 through December 2013 in an effort to gain Plaintiff's business, which would involve Plaintiff selling Defendants' pans to Plaintiff's customers.

13.

In November 2013, Defendants traveled to the State of Georgia and met with HDS employees in Georgia in an effort to solicit products and gain the business of Plaintiff.

14.

Defendants began transacting business within the State of Georgia in January 2014 by entering into a Supplier Buying Agreement with Plaintiff, which is headquartered in Atlanta, Georgia, whereby Defendants sold their pans to Plaintiff and to Plaintiff's customers.

15.

Defendants engaged in a persistent course of conduct by transacting business within the State of Georgia by selling its pans to Plaintiff, which is headquartered in Atlanta, Georgia, between approximately 2014 and early 2018, which involved Defendants delivering its pans into the State of Georgia, from which Defendants derived substantial revenue from the State of Georgia.

16.

While transacting business with Plaintiff and its customers between 2014 and 2015, Defendants benefited substantially from the Georgia marketplace and made frequent contacts with individuals the State of Georgia in the form of e-mails and telephone calls.  Between 2014 and 2015, Defendants delivered its pans into the State of Georgia, from which Defendants derived substantial revenue from the State of Georgia.

17.

In November 2015, Defendants traveled to Georgia to participate in Plaintiff's supplier summit in an effort to maintain the business relationship between Plaintiff and Defendants, and continue soliciting business. During the summit, Defendants met with and communicated with Plaintiff's employees in Georgia, and Defendants invited Plaintiff's employees out to dinner to continue soliciting business.

18.

While transacting business with Plaintiff and its customers between 2016 and 2018, Defendants benefited substantially from the Georgia marketplace and made frequent contacts with Plaintiff's employees who are residents of the State of Georgia in the form of e-mails and telephone calls.  Between 2016 and 2018, Defendants delivered its pans into the State of Georgia, from which Defendants

derived substantial revenue from the State of Georgia, which include Defendants receiving the following income from pans sold to the State of Georgia that were shipped from Defendants to the State of Georgia:

- $3,536.05 from March 2016 sales

- $3,536.05 from September 2016 sales

- $3,840.00 from April 2017 sales

- $6,413.00 from June 2017 sales

- $7,758.00 from September 2017 sales

- $2,534.00 from November 2017 sales

- $2,612.00 from February 2018 sales

19.

Defendants derived $30,229.10 of revenue between 2016 and 2018 from pans sold to the State of Georgia that were shipped from Defendants to the State of Georgia.

20.

In 2016, Defendants traveled to Georgia to visit Plaintiff and Plaintiff's Georgia employees, and Defendants brought samples of its pop-up products it was soliciting to Plaintiff, in an effort to persuade Plaintiff to begin selling its pop-up products.

21.

In 2017, Plaintiff began selling Defendants pop-up products. Between 2017 and 2018, Defendants delivered its pop-up products into the State of Georgia, from which Defendants derived substantial revenue from the State of Georgia, which include Defendants receiving the following income from pop-up products sold to the State of Georgia that were shipped from Defendants to the State of Georgia:

- $ 5,873.28 from October 2017 sales

- $53,170.00 from March 2018 sales

22.

Defendants derived $59,043.28 of revenue between 2017 and 2018 from pop-up products sold to the State of Georgia that were shipped from Defendants to the State of Georgia and thereby Defendants purposefully accepted the benefits of Georgia's marketplace.

23.

As such, Defendants derived a total of $89,272.38 of revenue between 2016 and 2018 from products it sold to the State of Georgia that were shipped from Defendants to the State of Georgia and thereby Defendants purposefully accepted the benefits of Georgia's marketplace.

24.

Defendants traveled to the State of Georgia again in February 2017 to meet with Plaintiff's employees who were Georgia residents at Plaintiff's headquarters

8

in Georgia for a product meeting in an effort to maintain the business relationship between Plaintiff and Defendants and solicit business.

25.

Between 2014 and 2018, Defendants made frequent contacts with residents of the State of Georgia in the form of e-mails and telephone calls.  In fact, Defendants sent ninety-five (95) emails to Plaintiff's employees who are located and reside in Georgia between March 21, 2017 and November 9, 2018 alone.

26.

Plaintiff is informed, and therefore believes, that Plaintiff was Defendants' largest customer during the time they did business together.

27.

Defendants negotiated and entered into a Confidential Settlement Agreement and Release, which ended their Supplier Buyer Agreement. Defendants purposefully availed themselves to the protections of Georgia law by bargaining for and executing a release that was governed by the laws of Georgia.

28.

Defendants operate an e-commerce website, https://washoutpan.com/, which functions for commercial purposes ("Defendants' e-commerce website").

29.

The telephone number listed in the contact page of Defendants' e-commerce website is "(323) 963-4117."

30.

Defendants' e-commerce website specifically targets customers located in the State of Georgia and this district for purposes of offering its products for sale to residents of the State of Georgia.

31.

Defendants' e-commerce website specifically solicits and transacts business with residents of the State of Georgia and this district.

32.

Defendants use the e-commerce website to continue availing themselves of the benefits of Georgia by accepting revenue from residents of the State of Georgia and this district.

33.

Defendants ship their products to residents of the State of Georgia for use within the State of Georgia and this district from orders placed on Defendants' e-commerce website.

34.

Defendants offer products on Defendants' e-commerce website in the State of Georgia that compete with Plaintiff's products in the State of Georgia and this district.

35.

Defendants have operated Defendants' e-commerce website to the detriment of Plaintiff, by communicating and disseminating false and misleading statements into the State of Georgia in an attempt to harm Plaintiff's business operations in this district.

36.

Defendants have admitted, under penalty of perjury, to selling products to residents of the State of Georgia through Defendants' e-commerce website.

37.

Defendants also operate another e-commerce website, https://www.ecobasins.com, which functions for commercial purposes ("Ecobasins e-commerce website"). Attached hereto as **Exhibit A** is a true and correct copy of the https://www.ecobasins.com home page.

38.

The top banner of the https://www.ecobasins.com e-commerce website states "WASHOUT PAN IS NOW ECOBASINS, WELCOME TO OUR NEW STORE!"

39.

The "About" page of the Ecobasins e-commerce website "https://www.ecobasins.com/about/" states "NOBODY KNOWS MORE ABOUT CONTAINMENT THAN US! – Reef Mowers."  Attached hereto as **Exhibit B** is a true and correct copy of the https://www.ecobasins.com/about/ page.

40.

The "About" page of the Ecobasins e-commerce website "https://www.ecobasins.com/about/" states "For over a decade, WashoutPan has been a leading designer and manufacturer of watertight steel containment basins for infrastructure and commercial/concrete construction in North America. Its reputation for quality, innovation, and safety make WashoutPan a recognized leader in the development of advanced job-site containment basins. Now, we are excited to introduce Ecobasins. Ecobasins is our new online storefront dedicated to delivering you the best buying experience and cheapest prices."

41.

The address and phone number listed in the contact information section of the Ecobasins e-commerce website is "5330 Alta Bahia Court San Diego, CA 92109" and "Tel: (323) 963-4117." This address is the same address listed as the address for Washoutpan.com LLC with the California Secretary of State. This

phone number is the same phone number listed as the contact number for

Washoutpan.com LLC.

<center>42.</center>

As of the drafting of this First Amended Complaint, there is no entity that

begins with the word "Ecobasins" registered as an LLC or corporation with the

State of California's Secretary of State.

<center>43.</center>

The "products" page of the Ecobasins e-commerce website offers for sale

"WashoutPan" branded pans.  Attached hereto as **Exhibit C** is a true and correct

copy of the https://www.ecobasins.com/containment-solutions/ page.

<center>44.</center>

The "warranty" page of the Ecobasins e-commerce website offers a warranty

for all "WashoutPan" branded pans.  Attached hereto as **Exhibit D** is a true and

correct copy of the https://www.ecobasins.com/warranty/ page.

<center>45.</center>

The "safety" page of the Ecobasins e-commerce website states at the top in

red font "Beware of known counterfeits made with lower quality components &

mislabeled country of origin. Protecting WASHOUT PAN™ customers Is a

priority." Attached hereto as **Exhibit E** is a true and correct copy of the

https://www.ecobasins.com/safety/ page.

46.

Plaintiff is informed, and therefore believes, that the Ecobasins e-commerce website is owned and operated by Defendants.

47.

The Ecobasins e-commerce website specifically targets customers located in the State of Georgia and this district for purposes of offering its products for sale to residents of the State of Georgia.

48.

The Ecobasins e-commerce website specifically solicits and transacts business with residents of the State of Georgia and this district.

49.

Defendants use the Ecobasins e-commerce website to continue availing themselves to the benefits of Georgia by accepting revenue from residents of the State of Georgia and this district.

50.

Ecobasins e-commerce website represents that Defendants will ship their products to residents of the State of Georgia.  These products can then be used within the State of Georgia and this district from orders placed on the Ecobasins e-commerce website.

51.

Defendants offer products for sale on the Ecobasins e-commerce website in the State of Georgia that compete with Plaintiff's products in the State of Georgia and this district.

52.

Defendants have solicited business relationships with other wholesalers who service Georgia-based customers.

53.

Plaintiff is informed, and therefore believes, that on at least one occasion, Defendants attended a trade show hosted by a competitor of the Plaintiff that is headquartered in the Southeast United States for the purpose of soliciting business and securing a contract with said competitor, which would increase defendants sales to Georgia consumers through the competitor's multiple branches located in Georgia.

54.

As of July 24, 2019, Defendants admit that "authorized retailers" of its products "include Pro Line, WYLCO Supply, Amazon."

55.

Amazon sells products to residents of the State of Georgia.

56.

15

Plaintiff is informed and believes that Pro Line Supply sells products to residents of the State of Georgia.

57.

At no time prior to the drafting of this complaint have Defendants registered for approval to do business as a foreign limited liability corporation with the Secretary of State for the State of Georgia, despite making multiple sales to residents of the State of Georgia, in what appears to be a calculated effort to thwart being subject to personal jurisdiction in Georgia.

58.

Defendants regularly solicit business and derive substantial revenue from goods used within the State of Georgia.

59.

Defendants offered and continue to offer warranties for products sold to Georgia citizens and, as such, created continuing obligations to Georgia residents.

60.

Defendants took deliberate actions aimed at Plaintiff, Plaintiff's headquarters, employees, and customers within the State Georgia and this district and, as such, created continuing obligations to Georgia residents, including Plaintiff.

61.

Defendants have also committed tortious injuries in the State of Georgia caused by acts outside the State of Georgia.

62.

Defendants intended for the effects of their injuries to be felt in the State of Georgia. Defendants specifically aimed their conduct at the State of Georgia in an attempt to divert potential and existing customers away from Plaintiff.

63.

Defendants have stores that sell products within this District in Georgia.

64.

Defendants knew Plaintiff has stores within this District in Georgia where it sells products to Georgia residents in this District and Defendants knew products it sold to Plaintiff would be sold in this District in Georgia. Consequently, Defendants could foresee its products being sold in this District in Georgia.

65.

All current and former employees of Plaintiff identified in this complaint, who are fact witnesses with testimony to support Plaintiff's allegations are residents of Georgia.

66.

Accordingly, Defendants are subject to the jurisdiction and venue of this Court pursuant to O.C.G.A. § 9-10-91, known as Georgia's Long Arm Statute.

17

67.

Venue is proper in this District, pursuant to 28 U.S.C. §1391(b)(2) and 28 U.S.C. §1391(b)(3).

## C. FACTUAL ALEGATIONS COMMON TO ALL COUNTS

68.

Plaintiff purchased pans from WP for resale between approximately 2014 and early 2018.

69.

Thereafter in 2018, Plaintiff began purchasing pans for resale from a vendor other than WP, which is a Limited Liability Company organized under the State of Georgia.

70.

Upon learning that Plaintiff was selling pans from another vendor, Mowers and WP created schemes that included extortion, wire fraud, false advertising and the commercial publication of malicious and vile false statements to be told by Defendants over and over again to the detriment of Plaintiff's business and impeccable reputation as an industrial distributor in North America.

71.

Defendants' shameful attacks on Plaintiff were a calculated effort to negatively impact Plaintiff's business and reputation and stifle fair competition in order to acquire Plaintiff's business for Defendants' own financial gain.

72.

LinkedIn is a business-centered social network that operates via a website and mobile application that is used for professional networking, job listing, recruiting, commercial advertising, company announcements, and industry updates. LinkedIn can be accessed, and posts can be viewed, in all 50 states. LinkedIn allows members (both employees and employers) to create profiles and "connections" to each other in an online social network.

73.

LinkedIn allows a user to create posts with text, photos, videos and links to other websites. Such posts are then visible at the user's LinkedIn page and can be viewed and accessed by any member of the public who visits the user's LinkedIn page. Additionally, such posts are visible on the homepages of the users (in their "feed") who follow the person who created the post. In such posts, LinkedIn allows users creating a post to "tag" another user on LinkedIn (the "tagged user") in the post, which will send a "notification" to the tagged user that the tag has occurred.

74.

Additionally, tagging a user in a post will make the post visible on the homepages of the tagged user's followers, in addition to the followers of the user who created the post.

75.

Mowers maintains a profile on LinkedIn, which can be accessed at https://www.linkedin.com/in/reefmowers/ where he has 10,113 followers[1], and describes himself as the owner of WP.  Mowers' LinkedIn page prominently promotes WP and his ownership of the company.  It notes that Mowers "[uses] his obsession to create the latest and greatest game changing containment products…."  Thus, Mowers' LinkedIn identity—and activity—is synonymous with the identity, commercial endeavors, and competitive motives of WP.  A true and correct copy of the Mowers' LinkedIn profile printed on May 23, 2019 is attached hereto as **Exhibit F**.

76.

Plaintiff maintains a profile on LinkedIn and has 10,351 followers[2], which can be accessed at https://www.linkedin.com/company/white-cap-construction-supply/.  Many of Plaintiff's LinkedIn followers are its customers.  A true and

---

[1] As of May 23, 2019.
[2] As of May 27, 2019.

correct copy of the Plaintiff's LinkedIn profile printed on May 27, 2019 is attached hereto as **Exhibit G**.

77.

Plaintiff's affiliate maintains a profile on LinkedIn has 41,646 followers[3], which can be accessed at https://www.linkedin.com/company/hd-supply/ . Many of Plaintiff's affiliate LinkedIn followers are Plaintiff's Georgia-based customers, some of whom are the customers who purchased Defendants' products.  A true and correct copy of the Plaintiff's affiliate LinkedIn profile printed on May 28, 2019 is attached hereto as **Exhibit H**.

78.

Plaintiff's Chief Operating Officer, Alan Sollenberger ("Sollenberger") is a resident of Georgia who maintains a profile on LinkedIn, which can be accessed at https://www.linkedin.com/in/alan-sollenberger-3065901/ .  A true and correct copy of the Sollenberger's LinkedIn profile printed on May 27, 2019 is attached hereto as **Exhibit I**.

79.

The Director of Product Category Management of Plaintiff, Jennifer Tomaszewicz ("Tomaszewicz") is a resident of Georgia who maintains a profile on LinkedIn, which can be accessed at https://www.linkedin.com/in/jennifer-

---

[3] As of May 28, 2019.

tomaszewicz-20b7a36a/ .  A true and correct copy of the Tomaszewicz's LinkedIn profile printed on September 4, 2019 is attached hereto as **Exhibit J**.

80.

Plaintiff's Vice President of Sales and Marketing, Jason Joice ("Joice"), is a resident of Georgia who maintains a profile on LinkedIn, which can be accessed at https://www.linkedin.com/in/jason-joice-82b4985/ .  A true and correct copy of the Joice's LinkedIn profile printed on September 4, 2019 is attached hereto as **Exhibit K**.

81.

Plaintiff's former Category Manager, Ian Freeman ("Freeman"), is a resident of Georgia who maintains a profile on LinkedIn, which can be accessed at https://www.linkedin.com/in/ian-freeman-a10184b/ .  A true and correct copy of the Freeman's LinkedIn profile printed on September 4, 2019 is attached hereto as **Exhibit L**.

82.

On or about October 18, 2018, Mowers published the following post to his LinkedIn page (the "October 18, 2018 post"), which tagged Plaintiff twice, its affiliate once, and Sollenberger once:



A true and correct copy of the October 18, 2018 post is attached hereto as

**Exhibit M**.

83.

As such, Plaintiff is informed and believes that the October 18, 2018 post was placed on the LinkedIn homepage feeds of over 10,000 of Mowers' followers, over 10,000 of Plaintiff's followers, over 40,000 of Plaintiff's affiliate's followers, to Sollenberger's followers and was published for any person in the world to see via the World Wide Web, including Georgia-based clients and potential clients. The October 18, 2018 post also sent notifications of the post to both Plaintiff and Sollenberger in Georgia that the post was made by Mowers.

84.

On or about November 1, 2018, Mowers published the following comment on his October 18, 2018 post on LinkedIn (the "November 1, 2018 comment"):



A true and correct copy of the November 1, 2018 post is attached hereto as **Exhibit N**.

85.

As such, Plaintiff is informed and believes that the November 1, 2018 comment was placed on the LinkedIn homepage feeds of over 10,000 of Mowers' followers and was published for any person in the world to see via the World Wide Web, including Georgia-based clients and potential clients.

86.

On or about November 25, 2018, Mowers published the following comment on his October 18, 2018 post on LinkedIn (the "November 25, 2018 comment")

which tagged Plaintiff, Sollenberger, United States Attorneys' Offices and Cal

OSHA:



A true and correct copy of the November 25, 2018 comment is attached

hereto as **Exhibit O**.

87.

As such, Plaintiff is informed and believes that the November 25, 2018

comment was placed on the LinkedIn homepage feeds of over 10,000 of Mowers'

followers, over 10,000 of Plaintiff's followers, to Sollenberger's followers, the

United States Attorneys' Offices followers, and Cal OSHA's followers and was

published for any person in the world to see via the World Wide Web, including

Georgia-based clients and potential clients.

88.

On or about November 26, 2018, Mowers published the following comment

on his October 18, 2018 post on LinkedIn (the "first November 26, 2018

comment"):



A true and correct copy of the first November 26, 2018 comment is attached

hereto as **Exhibit P**.

89.

As such, Plaintiff is informed and believes that the November 25, 2018

comment was placed on the LinkedIn homepage feeds of over 10,000 of Mowers'

followers and was published for any person in the world to see via the World Wide Web, including Georgia-based clients and potential clients.

90.

On October 18, 2018, Mowers sent the following text messages to Freeman, and Tomaszewicz (the "October 18, 2018 texts"):



A true and correct copy of the October 18, 2018 texts are attached hereto as **Exhibit Q**.

91.

These text messages were sent to, received, and viewed using devices located in Georgia. The transmission of these involved the use of Georgia-based hardware and commercial telephone equipment.

92.

On November 18, 2018, Mowers sent the following text messages to Tomaszewicz, (the "Tomaszewicz November 18, 2018 texts"):



A true and correct copy of the Tomaszewicz November 18, 2018 texts are

attached hereto as **Exhibit R**.

93.

On October 18, 2018, Mowers sent the following email to Joice (the

"October 18, 2018 email"):

Jason,

**HD Supply is adversely affecting my business in serious
violation of several laws.** Your immediate and help with a
resolution by end of day.

I created 'washout pan' and evolved it into the 'Brigade'
washout pan brand.

I spent the last decade investing every penny I made as a
former police officer and environmental pioneer bringing
my idea to life.

From engineering, cad drawings, market research, website,
photographs, videos, engineering calculation packets, load
testing, trade shows, PK trainings and selling exclusively to
HD Supply I created a unique product that is safe and trusted
by the construction industry and regulators. HD Supply just
changed that!

If you created a product and essentially put your life's work
and savings into, would you be ok if someone used your
pictures, data and verbiage that was cut and pasted to market
on their website and catalogs selling and profiting from a
copycat product? No. Even if you answered yes, **it's
unethical and against the law.** HD Supply is a publicly
traded company and has a fiduciary duty to protect

shareholders, right?

After several written request to this date your company continues to use all of my materials I created, own rights, market online at whitecap.com and HD Supply and pay for google ad words with all my content and profiting and **killing my revenue using 'switch and bait' scam sales tactics**.

In addition, I have written documentation that your office has requested from my engineering company OSHA safety calculation packets I personally paid for and created unique to my product that prevent death and injury to use for new sales and providing those documents **faking federal OSHA requirements**.

**I'd suggest you recall all the sold since February using my data or put together a strategy where we can stock all of your branches like we agreed to and provide the best and safe product to your customers.**

By the way, **it's a criminal offense selling and marketing fake OSHA products that result in jail time.** I have proving you knew about this previously.

And I recently purchased a fake pan on your website.

Next step?

(Emphasis added.)

A true and correct copy of the October 18, 2018 e-mail is attached hereto as

**Exhibit S**.

94.

On October 30, 2018, Mowers an email to Harris (the "October 30, 2018

email") which provided in relevant part:

> The U.S. District Attorney prioritizes production on
> infringement cases when it comes to health and safety
> products. It would be a felony to market our pans and sell
> another.
>
> https://www.justice.gov/sites/default/files/criminal-
> ccips/legacy/2015/03/26prosecuting_ip_crims_manual_2013
> .pdf
>
> We are aware that a copy of our product is being purchased
> regularly from fabricator(s) in California and possibly
> Florida, marketed and sold using a 'copy and paste' strategy
> with all of our original works of arts. For example, purchase
> roder 2632559.
>
> **You have no idea the economic impact this has caused
> my company, let alone the stress**.

A true and correct copy of the October 30, 2018 e-mail is attached hereto as

**Exhibit T**.

<div align="center">95.</div>

On November 14, 2018, long after Plaintiff severed its relationship with

Defendants and Plaintiff was selling pans supplied by a company other than WP,

Defendants visited Plaintiff's Georgia-based website and purchased a 72" x 72" x

24" pan from Plaintiff through Plaintiff's website, Order Number 30775662,

<div align="center">32</div>

paying the Georgia company with an American Express credit card knowing that the pan purchased and would be delivered would not be a WP (his company's) pan in response to the order.

96.

The order for the 72" x 72" x 24" pan was processed by Plaintiff's Atlanta headquarters.

97.

Defendants purchased the 72" x 72" x 24" pan from Plaintiff through Plaintiff's website knowing from Defendants' prior business relationship with Plaintiff that Plaintiff's employees in Georgia control and maintain Plaintiff's website, and that orders placed through Plaintiff's website are processed by Plaintiff's employees in Georgia.

98.

Plaintiff is informed and therefore believes that the 72" x 72" x 24" pan that was received by the Defendants pursuant to Order Number 30775662 was completed being manufactured in the State of Georgia.

99.

The 72" x 72" x 24" pan that was received by the Defendants pursuant to Order Number 30775662 was originally shipped from the State of Georgia, by a Limited Liability Company organized under the State of Georgia.

100.

Defendants ordered the 72" x 72" x 24" pan to allow Defendants the opportunity to inspect and photograph the pan, which allowed Defendants to further perpetuate their malicious fabrication and dissemination of false information and defamatory commercial statements against Plaintiff with the intent to injure Plaintiff.

101.

After receiving and photographing the 72" x 72" x 24" pan pursuant to Order Number 30775662, Mowers proceeded to contact the credit card company to fraudulently dispute the charges for the pan by telling the credit card company that the pan Plaintiff sold to Mowers was counterfeit. Defendants also proceeded to "file a report with them [American Express] that will allow a review and suspension of merchant processing for HD SUPPLY Construction & Industrial – White Cap HD Supply.  They [American Express] take selling of fake goods/misrepresentation very serious!"  Plaintiff incurred monetary damages as a result of Mowers' dispute of the credit card charges for the pan purchased from Plaintiff that he knew would not be a WP pan before he ordered the pan, including but not limited to, the freight costs associated with the initial delivery of the pan to Defendants, and the freight costs associated with the pick-up of the pan from Defendants after Defendants disputed the credit card charges for the pan.

102.

On November 14, 2018, long after Plaintiff severed its relationship with Defendants and Plaintiff was selling pans supplied by a company other than WP, Defendants visited Plaintiff's Georgia-based website and purchased a 72" x 72" x 14" pan, Order Number 30770235, and paid the Georgia company with an American Express credit card knowing that the pan purchased and would be delivered would not be a WP (his company's) pan in response to the order.

103.

The order for this pan was processed by Plaintiff's Atlanta office.

104.

Defendants purchased the 72" x 72" x 14" pan from Plaintiff through Plaintiff's website knowing from Defendants' prior business relationship with Plaintiff that Plaintiff's employees in Georgia control and maintain Plaintiff's website, and that orders placed through Plaintiff's website are processed by Plaintiff's employees in Georgia.

105.

Plaintiff is informed and therefore believes that the 72" x 72" x 14" pan that was received by the Defendants pursuant to Order Number 30770235 was completed being manufactured in the State of Georgia.

106.

The 72" x 72" x 14" pan that was received by the Defendants pursuant to Order Number 30770235 was originally shipped from the State of Georgia, by a Limited Liability Company organized under the State of Georgia.

107.

Defendants ordered the 72" x 72" x 14" pan to allow Defendants the opportunity to inspect and photograph the pan, which allowed Defendants to further perpetuate their malicious fabrication and dissemination of false information and defamatory commercial statements against Plaintiff with the intent to injure Plaintiff.

108.

After receiving and photographing the 72" x 72" x 14" pan pursuant to Order Number 30770235[4], Mowers proceeded to contact the credit card company to fraudulently dispute the charges for the pan by telling the credit card company that the pan Plaintiff sold to Mowers was counterfeit. Defendants also proceeded to "file a report with them [American Express] that will allow a review and suspension of merchant processing for HD SUPPLY Construction & Industrial – White Cap HD Supply.  They [American Express] take selling of fake goods/misrepresentation very serious!"  Plaintiff incurred monetary damages as a

---

[4] Both the 72" x 72" x 14" pan involved with Order Number 30770235 and the 72" x 72" x 24" pan involved with Order Number 30775662 are collectively referred to as the "Georgia pans."

result of Mowers' dispute of the credit card charges for the pan purchased from Plaintiff that he knew would not be a WP pan before he ordered the pan, including but not limited to, the freight costs associated with the initial delivery of the pan to Defendants, and the freight costs associated with the pick-up of the pan from Defendants after Defendants disputed the credit card charges for the pan.

<div align="center">109.</div>

Mowers effectuated the purchases of the Georgia pans by deliberately visiting Plaintiff's website and placing the orders, thereby entering a commercial transaction with a business operating in Georgia.

<div align="center">110.</div>

On or about November 16, 2018, Mowers sent Sollenberger the following messages via LinkedIn (the "November 16, 2018 messages"):



A true and correct copy of the November 16, 2018 messages is attached

hereto as **Exhibit U**.

111.

It appears one of the Georgia pans is depicted in a photograph sent to

Sollenberger in the November 16, 2018 messages.

112.

On or about November 17, 2018, Mowers sent Joice the following text messages (the "November 17, 2018 texts"):



A true and correct copy of the "November 17, 2018 texts" is attached hereto as **Exhibit V**.

113.

It appears one of the Georgia pans is depicted in a photograph sent to Joice in the November 17, 2018 texts.

114.

On or about November 17, 2018, Mowers published the following comment on his October 18, 2018 post on LinkedIn (the "November 17, 2018 comment"):



As such, Plaintiff is informed and believes that the November 17, 2018 comment was placed on the LinkedIn homepage feeds of over 10,000 of Mowers'

followers, over 10,000 of Plaintiff's followers, over 40,000 of Plaintiff's affiliate's

followers, to Sollenberger's followers and was published for any person in the

world to see via the World Wide Web, including Georgia-based clients and

potential clients.

115.

On or about November 18, 2018 (a Sunday), Mowers sent Joice the

following text messages (the "Joice November 18, 2018 texts"):



A true and correct copy of the Joice November 18, 2018 texts is attached

hereto as **Exhibit W**.

<div align="center">116.</div>

It appears one of the Georgia pans is depicted in a photograph sent to Joice

in the November 18, 2018 texts.

117.

On or about November 17, 2018, Mowers published the following post to his LinkedIn page (the "first November 17, 2018 post"), which tagged Plaintiff, Plaintiff's affiliate and the United States Attorneys' Offices:



A true and correct copy of the first November 17, 2018 post is attached hereto as **Exhibit X**.

118.

As such, Plaintiff is informed and believes that the first November 17, 2018 post was placed on the LinkedIn homepage feeds of over 10,000 of Mowers' followers, over 10,000 of Plaintiff's followers, over 40,000 of Plaintiff's affiliate's followers and was published for any person in the world to see via the World Wide Web, including Georgia-based clients and potential clients. The first November 17, 2018 post also sent notifications of the post to Plaintiff that the post was made by

Mowers.  The post was viewable by and intended to have negative consequences upon Plaintiff's Georgia-based clientele.

119.

On or about November 17, 2018, Mowers published the following post to his LinkedIn page (the "second November 17, 2018 post"), which tagged Plaintiff and the United States Attorneys' Offices:



A true and correct copy of the second November 17, 2018 post is attached hereto as **Exhibit Y**.

120.

It appears one of the Georgia pans is depicted in a photograph included in the second November 17, 2018 post.

121.

As such, Plaintiff is informed and believes that the second November 17, 2018 post was placed on the LinkedIn homepage feeds of over 10,000 of Mowers' followers, over 10,000 of Plaintiff's followers and was published for any person in the world to see via the World Wide Web, including Georgia-based clients and potential clients. The second November 17, 2018 post also sent notifications of the post to Plaintiff that the post was made by Mowers.  The post was viewable by and intended to have negative consequences upon Plaintiff's Georgia-based clientele.

122.

On or about November 17, 2018, Mowers published the following post to his LinkedIn page (the "third November 17, 2018 post"), which tagged Plaintiff's affiliate and Sollenberger:



A true and correct copy of the third November 17, 2018 post is attached hereto as **Exhibit Z**.

<div align="center">123.</div>

As such, Plaintiff is informed and believes that the third November 17, 2018 post was placed on the LinkedIn homepage feeds of over 10,000 of Mowers' followers, and over 40,000 of Plaintiff's affiliate's followers and was published for any person in the world to see via the World Wide Web, including Georgia-based clients and potential clients. The third November 17, 2018 post also sent

notifications of the post to Plaintiff and Sollenberger that the post was made by Mowers.

<div align="center">124.</div>

On or about November 18, 2018, Mowers published the following post to his LinkedIn page (the "first November 18, 2018 post"), which tagged Plaintiff, Plaintiff's affiliate, Cal Osha and the United States Attorneys' Offices:



A true and correct copy of the first November 18, 2018 post is attached hereto as **Exhibit AA**.

<div align="center">125.</div>

It appears one of the Georgia pans is depicted in a photograph included in the first November 18, 2018 post.

<div align="center">126.</div>

As such, Plaintiff is informed and believes that the first November 18, 2018 post was placed on the LinkedIn homepage feeds of over 10,000 of Mowers'

followers, over 10,000 of Plaintiff's followers, over 40,000 of Plaintiff's affiliate's

followers and was published for any person in the world to see via the World Wide

Web, including Georgia-based clients and potential clients. The first November 18,

2018 post also sent notifications of the post to Plaintiff that the post was made by

Mowers.  The post was viewable by and intended to have negative consequences

upon Plaintiff's Georgia-based clientele.

127.

On or about November 18, 2018, Mowers published the following post to

his LinkedIn page (the "second November 18, 2018 post"), which tagged Plaintiff

and Plaintiff's affiliate:



A true and correct copy of the second November 17, 2018 post is attached

hereto as **Exhibit BB**.

128.

The Georgia pans are the subject of the second November 18, 2018 post.

129.

As such, Plaintiff is informed and believes that the second November 18, 2018 post was placed on the LinkedIn homepage feeds of over 10,000 of Mowers' followers, Plaintiff's followers and over 40,000 of Plaintiff's affiliate's followers and was published for any person in the world to see via the World Wide Web, including Georgia-based clients and potential clients. The second November 18, 2018 post also sent notifications of the post to Plaintiff that the post was made by Mowers.

130.

On or about November 18, 2018, Mowers published the following post to his LinkedIn page (the "third November 18, 2018 post"), which tagged Plaintiff's affiliate and Plaintiff:



A true and correct copy of the third November 18, 2018 post is attached

hereto as **Exhibit CC**.

131.

The Georgia pans are the subject of the third November 18, 2018 post.

132.

As such, Plaintiff is informed and believes that the third November 18, 2018

post was placed on the LinkedIn homepage feeds of over 10,000 of Mowers'

followers and over 40,000 of Plaintiff's affiliate's followers, Plaintiff's followers

and was published for any person in the world to see via the World Wide Web,

including Georgia-based clients and potential clients. The third November 18,

2018 post also sent notifications of the post to Plaintiff that the post was made by Mowers.

<center>133.</center>

On or about November 18, 2018, Mowers published the following post to his LinkedIn page (the "fourth November 18, 2018 post"), which tagged Plaintiff's affiliate and Sollenberger:



A true and correct copy of the fourth November 18, 2018 post is attached hereto as **Exhibit DD**.

<center>134.</center>

It appears one of the Georgia pans is depicted in a photograph included in the fourth November 18, 2018 post.

135.

As such, Plaintiff is informed and believes that the fourth November 18, 2018 post was placed on the LinkedIn homepage feeds of over 10,000 of Mowers' followers and over 40,000 of Plaintiff's affiliate's followers, Sollenberger's followers and was published for any person in the world to see via the World Wide Web, including Georgia-based clients and potential clients. The fourth November 18, 2018 post also sent notifications of the post to Plaintiff and to Sollenberger that the post was made by Mowers.

136.

On or about November 18, 2018, Mowers published the following post to his LinkedIn page (the "fifth November 18, 2018 post"):



A true and correct copy of the fifth November 18, 2018 post is attached hereto as **Exhibit EE**.

137.

As such, Plaintiff is informed and believes that the fifth November 18, 2018 post was placed on the LinkedIn homepage feeds of over 10,000 of Mowers' followers and was published for any person in the world to see via the World Wide Web, including Georgia-based clients and potential clients.

138.

On or about November 18, 2018, Mowers published the following post to his LinkedIn page (the "sixth November 18, 2018 post"), which tagged Plaintiff's affiliate:



A true and correct copy of the sixth November 18, 2018 post is attached hereto as **Exhibit FF**.

139.

As such, Plaintiff is informed and believes that the sixth November 18, 2018 post was placed on the LinkedIn homepage feeds of over 10,000 of Mowers' followers, the followers of the United States Attorneys' Offices, and was published for any person in the world to see via the World Wide Web, including Georgia-based clients and potential clients.

140.

On or about November 26, 2018, Mowers published the following post to his LinkedIn page (the "first November 26, 2018 post"):



A true and correct copy of the first November 26, 2018 post is attached hereto as **Exhibit GG**.

141.

As such, Plaintiff is informed and believes that the first November 26, 2018

post was placed on the LinkedIn homepage feeds of over 10,000 of Mowers'

followers and was published for any person in the world to see via the World Wide

Web, including Georgia-based clients and potential clients.

<div align="center">142.</div>

On or about November 26, 2018, Mowers published the following post to

his LinkedIn page (the "second November 26, 2018 post"), which tagged Plaintiff

once, its affiliate three times, and Sollenberger once:



A true and correct copy of the second November 26, 2018 post is attached hereto as **Exhibit HH**.

143.

As such, Plaintiff is informed and believes that the second November 26, 2018 post was placed on the LinkedIn homepage feeds of over 10,000 of Mowers' followers, over 10,000 of Plaintiff's followers, over 40,000 of Plaintiff's affiliate's followers, to Sollenberger's followers and was published for any person in the world to see via the World Wide Web, including Georgia-based clients and potential clients. The second November 26, 2018 post also sent notifications of the post to both Plaintiff and Sollenberger in Georgia that the post was made by Mowers.

144.

On or about November 26, 2018, Mowers published the following post to his LinkedIn page (the "third November 26, 2018 post"), which tagged Plaintiff once and its affiliate once and contained an "URGENT CRANE/RIGGING SAFETY NOTICE FOR ALL JOB-SITES IN THE USA" (the "November 26, 2018 Safety Notice"):



A true and correct copy of the third November 26, 2018 post is attached

hereto as **Exhibit II**.

145.

It appears the Georgia pans are depicted in photographs included in the

November 26, 2018 post.

146.

As such, Plaintiff is informed and believes that the third November 26, 2018

post was placed on the LinkedIn homepage feeds of over 10,000 of Mowers'

followers, over 10,000 of Plaintiff's followers, over 40,000 of Plaintiff's affiliate's followers, followers and was published for any person in the world to see via the World Wide Web, including Georgia-based clients and potential clients. The third November 26, 2018 post also sent notifications of the post to Plaintiff in Georgia that the post was made by Mowers.

147.

On or about November 26, 2018, Mowers published the following post to his LinkedIn page (the "fourth November 26, 2018 post"), which tagged Plaintiff once, its affiliate once, the United States Attorneys' Offices, OSHA, the US Environmental Protection Agency, and Cal OSHA:



A true and correct copy of the fourth November 26, 2018 post is attached hereto as **Exhibit JJ**.

148.

As such, Plaintiff is informed and believes that the fourth November 26, 2018 post was placed on the LinkedIn homepage feeds of over 10,000 of Mowers' followers, over 10,000 of Plaintiff's followers, over 40,000 of Plaintiff's affiliate's followers, the followers of the United States Attorneys' Offices, OSHA, the US Environmental Protection Agency, and Cal OSHA and was published for any person in the world to see via the World Wide Web, including Georgia-based

clients and potential clients. The fourth November 26, 2018 post also sent

notifications of the post to Plaintiff.

149.

On or about November 26, 2018, Mowers published the following post to

his LinkedIn page (the "Fifth November 26, 2018 post"), which tagged Plaintiff

and Sollenberger:



A true and correct copy of the fifth November 26, 2018 post is attached

hereto as **Exhibit KK**.

150.

It appears one of the Georgia pans is depicted in a photograph included in

the fifth November 26, 2018 post.

151.

As such, Plaintiff is informed and believes that the fifth November 26, 2018

post was placed on the LinkedIn homepage feeds of over 10,000 of Mowers'

followers, over 10,000 of Plaintiff's followers and Sollenberger and was published for any person in the world to see via the World Wide Web, including Georgia-based clients and potential clients. The fifth November 26, 2018 post also sent notifications of the post to Plaintiff and Sollenberger in Georgia.

152.

On or about November 26, 2018, Mowers published the following post and a 34 second video to his LinkedIn page (the "Sixth November 26, 2018 post"), which tagged Plaintiff and its affiliate:



A true and correct copy of the sixth November 26, 2018 post is attached hereto as **Exhibit LL**.

153.

It appears one of the Georgia pans is depicted in the video included in the sixth November 26, 2018 post.

154.

As such, Plaintiff is informed and believes that the sixth November 26, 2018 post was placed on the LinkedIn homepage feeds of over 10,000 of Mowers' followers, over 10,000 of Plaintiff's followers, over 40,000 of Plaintiff's affiliates followers and was published for any person in the world to see via the World Wide Web, including Georgia-based clients and potential clients. The sixth November 26, 2018 post also sent notifications of the post to Plaintiff in Georgia.

155.

On or about November 26, 2018, Mowers published the following comment to his LinkedIn page (the "November 26, 2018 comment"):



A true and correct copy of the November 26, 2018 comment is attached

hereto as **Exhibit MM**.

<div align="center">156.</div>

It appears one of the Georgia pans is depicted in a photograph included in

the November 26, 2018 comment.

<div align="center">157.</div>

As such, Plaintiff is informed and believes that the November 26, 2018

comment was placed on the LinkedIn homepage feeds of over 10,000 of Mowers'

followers and was published for any person in the world to see via the World Wide Web, including Georgia-based clients and potential clients.

158.

On November 30, 2018, Plaintiff's counsel sent Mowers written correspondence via Certified Mail specifically requesting that Mowers (1) immediately cease and desist from issuing false and misleading statements regarding HD Supply, its products, and its personnel; and (2) cease and desist from further harassing, disparaging, and defaming HD Supply, its products, and its personnel either through electronic means, or in person.  A true and correct copy of Plaintiff's counsel's November 30, 2018 written correspondence to Mowers is attached hereto as **Exhibit NN**.  As further outlined below, Mowers failed to comply with the November 30, 2018 cease and desist letter.

159.

On or about December 3, 2018, Mowers published the following post to his LinkedIn page (the "December 3, 2018 post"):



A true and correct copy of the December 3, 2018 post is attached hereto as

**Exhibit OO**.

160.

As such, Plaintiff is informed and believes that the December 3, 2018 post

was placed on the LinkedIn homepage feeds of over 10,000 of Mowers' followers,

and was published for any person in the world to see via the World Wide Web,

including Georgia-based clients and potential clients.

161.

On December 4, 2018, Mowers sent the following email to Brian Harris of

Plaintiff's legal department (the "December 4, 2018 email"):

> Brian,
>
> Gabe forwarded me your letter and I removed all posts from
> Linkedin, even though I strongly disagree due to the
> immediate risk of injury or death to public safety.
>
> Washout Pan are lifted by cranes on all types of job-sites
> and flown over city streets, freeways and bridges and can
> weight almost 18,000 lbs when full of concrete.
>
> If a pan fails while being craned over the public it could be
> catastrophic.
>
> In good faith, I've attached the paperwork from the two
> separate purchase I made and received that are a completely
> different product than listed on your website and
> receipt.  The 727214 pan shipped from your Oregon branch
> had a packing slip with a certificate for lifting copied from
> our engineering calculation packets with the copied SKU.
>
> Also the weights listed on the BOL and other paperwork list
> our SKUS and weights.  I've attached certified paperwork
> that weighed the pans we received are significantly less and
> visually light - missing structural reinforcement and stamps.
>
> I've had time to absorb everything and I'd like to suggest a
> 'customer first' solution the would benefit both of our
> companies rather than go through litigation.  Emotions
> aside, we could safely exchange our pans for your sold
> copied Washout Pans minimizing risks coupled with a
> followed through stocking strategy for all branches of our
> Washout Pans.
>
> It would be a win-win for everyone including the end user.

> If this is an option please text me at 858.250.9240 bye end
> of day as I've hired new counsel who specialize in IP and
> will be filing in both state and federal court this week.
>
> Respectfully submitted
>
> Reef Mowers
> Washout Pan
> San Diego, California
> 323.963.4117

A true and correct copy of the December 4, 2018 email is attached hereto as

**Exhibit PP**.

162.

On December 9, 2018, Mowers sent the following email to Harris (the

"December 9, 2018 email"):

> 20 years prison for removing the safety data/origin on the D
> rings. Let's pray to god nobody get hurt [sic] – please recall
> these pans so we can all sleep at night.

A true and correct copy of the December 9, 2018 email is attached hereto as

**Exhibit QQ**.

163.

The December 9, 2018 email contained an attachment entitled "CRANE &

RIGGING JOB-SITE SAFETY ALERT":



A true and correct copy of the CRANE & RIGGING JOB-SITE SAFETY

ALERT is attached hereto as **Exhibit RR**.

### 164.

It appears the Georgia pans are depicted in photographs included in the

CRANE & RIGGING JOB-SITE SAFETY ALERT.

### 165.

Plaintiff is informed and believes that the CRANE & RIGGING JOB-SITE

SAFETY ALERT attached hereto as **Exhibit RR** was published to the public by

Defendants via electronic means.

166.

On or about December 11, 2018, Mowers published the following post to his

LinkedIn page (the "first December 11, 2018 post"):



A true and correct copy of the first December 11, 2018 post is attached

hereto as **Exhibit SS**.

167.

It appears the Georgia pans are depicted in photographs included in the first December 11, 2018 post.

168.

The first December 11, 2018 post included a photo of the "CRANE & RIGGING JOB-SITE SAFETY ALERT."

169.

As such, Plaintiff is informed and believes that the first December 11, 2018 post was placed on the LinkedIn homepage feeds of over 10,000 of Mowers' followers, and was published for any person in the world to see via the World Wide Web, including Georgia-based clients and potential clients.

170.

On or about December 11, 2018, Mowers published the following post to his LinkedIn page (the "second December 11, 2018 post"):



A true and correct copy of the second December 11, 2018 post is attached hereto as **Exhibit TT**.

171.

It appears one of the Georgia pans is depicted in a photograph included in the December 11, 2018 post.

172.

As such, Plaintiff is informed and believes that the second December 11, 2018 post was placed on the LinkedIn homepage feeds of over 10,000 of Mowers'

followers, and was published for any person in the world to see via the World Wide Web, including Georgia-based clients and potential clients.

173.

Between January and April of 2019, Mowers personally appeared on no less than three separate occasions at multiple construction sites of general contractor Adolfson & Peterson Construction, who is a customer of Plaintiff, that purchased and was using Plaintiff's pans on its jobsites.  On Mowers' first construction site appearance, he fraudulently impersonated an OSHA inspector, representing himself to employees of Adolfson & Peterson Construction as an employee of OSHA.  During this first appearance while Mowers was fraudulently impersonating an OSHA inspector, he made slanderous and defamatory false statements to employees of Adolfson & Peterson Construction with respect to Plaintiff and/or Plaintiff's pans that were on the jobsite, including but not limited to, that Plaintiff's pans were not OSHA certified and that Adolfson & Peterson Construction could be punished by OSHA for continuing its use of Plaintiff's pans on the construction site. During his second and third construction site visits, Mowers continued to make slanderous and defamatory false statements to employees of Adolfson & Peterson Construction with respect to Plaintiff's pans that were on the jobsite and told them that he was actually not employed by OSHA, but was rather the owner of WP, and was there in an effort to sell Adolfson

& Peterson Construction pans manufactured by WP. During one of Mowers' visits to Adolfson & Peterson Construction's construction sites, Mowers told Adolfson & Peterson Construction's employees that he notified local television stations and the city council about the alleged improper use of Plaintiff's "counterfeit" pans.

174.

As a result of Mowers fraudulently impersonating an OSHA inspector, and the slanderous and defamatory false statements he made to employees of Adolfson & Peterson Construction with respect to Plaintiff and Plaintiff's pans, Adolfson & Peterson Construction contacted Plaintiff's Atlanta headquarters requesting to return Plaintiff's pans and Adolfson & Peterson Construction also requested a refund for these products from Plaintiff's Atlanta headquarters.

175.

As a direct and proximate result of Mowers' conduct, Plaintiff lost profit from its prior sales of pans to Adolfson & Peterson Construction after Adolfson & Peterson Construction returned such pans.

176.

As a result of Mowers fraudulently impersonating an OSHA inspector, and the slanderous and defamatory false statements he made to employees of Adolfson & Peterson Construction with respect to Plaintiff and/or Plaintiff's pans, Mowers caused economic damages to Plaintiff  in the form of lost sales and harmed

Plaintiffs' reputation, existing, and prospective business relationship with its customer, Adolfson & Peterson Construction.

177.

Plaintiff is informed and believes that Defendants made slanderous and defamatory false statements about Plaintiff and Plaintiff's pans at a construction related trade show to Plaintiff's customers and potential customers between January and April of 2019.

178.

Plaintiff is informed and believes that between January and May of 2019, Mowers personally appeared on at least one construction site of commercial concrete contractors The Conco Companies, a customer of Plaintiff, that purchased and was using Plaintiff's pans on its construction site. While on the construction site of The Conco Companies, Plaintiff is informed and believes that Mowers made slanderous and defamatory false statements to employees of The Conco Companies with respect to Plaintiff and/or the Plaintiff's pans that were on the jobsite, the specific details of which exist in the form of evidence under the Defendants' knowledge and control to which Plaintiff does not uniquely have access to that will be acquired through discovery.

179.

Mowers aforementioned actions with The Conco Companies have

negatively affected Plaintiffs' reputation and prospective business relationship with

its customer, The Conco Companies.

180.

On or about April 23, 2019, Mowers published the following post to his

LinkedIn page (the "April 23, 2019 post"):



A true and correct copy of the April 23, 2019 post is attached hereto as

**Exhibit UU**.

181.

As such, Plaintiff is informed and believes that the April 23, 2019 post was placed on the LinkedIn homepage feeds of over 10,000 of Mowers' followers and was published for any person in the world to see via the World Wide Web, including Georgia-based clients and potential clients.

182.

As of the drafting of the original complaint filed in this matter, the April 23, 2019 post was still active on Mowers LinkedIn profile and was accessible to any individual in the world via the World Wide Web, including Georgia-based clients and potential clients.

183.

On or about May 9, 2019, Mowers published the following post to his LinkedIn page (the "first May 9, 2019 post"):



A true and correct copy of the first May 9, 2019 post is attached hereto as

**Exhibit VV**.

184.

It appears one of the Georgia pans is depicted in a photograph included in the first May 9, 2019 post.

185.

Plaintiff is informed and believes the photograph included in the first May 9, 2019 post is a photo of a component part of a pan sold by Plaintiff.

186.

As such, Plaintiff is informed and believes that the first May 9, 2019 post was placed on the LinkedIn homepage feeds of over 10,000 of Mowers' followers and was published for any person in the world to see via the World Wide Web, including Georgia-based clients and potential clients.

187.

As of the drafting of the original complaint filed in this matter, the first May 9, 2019 post was still active on Mowers' LinkedIn profile and was accessible to any individual in the world via the World Wide Web, including Georgia-based clients and potential clients.

188.

On or about May 9, 2019, Mowers published the following post to his LinkedIn page (the "second May 9, 2019 post"):



A true and correct copy of the second May 9, 2019 post is attached hereto as **Exhibit WW**.

189.

As such, Plaintiff is informed and believes that the second May 9, 2019 post was placed on the LinkedIn homepage feeds of over 10,000 of Mowers' followers and was published for any person in the world to see via the World Wide Web, including Georgia-based clients and potential clients.

190.

The second May 9, 2019 post disingenuously makes it appear as if Plaintiff's pans were involved in the Seattle crane accident that is the subject of the article link contained in the second May 9, 2019 post, all to further perpetuate Defendants' plan and schemes to destroy Plaintiffs' reputation and current/prospective business relationships, including those formed upon the Georgia marketplace.

191.

As of the drafting of the original complaint filed in this matter, the second May 9, 2019 post was still active on Mowers' LinkedIn profile and was accessible to any individual in the world via the World Wide Web, including Georgia-based clients and potential clients.

192.

On or about May 9, 2019, Mowers published the following post to his LinkedIn page (the "third May 9, 2019 post"):



A true and correct copy of the third May 9, 2019 post is attached hereto as

**Exhibit XX**.

193.

It appears one of the Georgia pans is depicted in a photograph included in the third May 9, 2019 post.

194.

As such, Plaintiff is informed and believes that the third May 9, 2019 post was placed on the LinkedIn homepage feeds of over 10,000 of Mowers' followers and was published for any person in the world to see via the World Wide Web, including Georgia-based clients and potential clients.

195.

As of the drafting of the original complaint filed in this matter, the third May 9, 2019 post, which indirectly targets a Georgia company, was still active on Mowers' LinkedIn profile and was accessible to any individual in the world via the World Wide Web, including Georgia-based clients and potential clients.

196.

On or about May 16, 2019, Mowers published the following post to his LinkedIn page (the "first May 16, 2019 post"):



A true and correct copy of the first May 16, 2019 post is attached hereto as

**Exhibit WW**.

197.

It appears the Georgia pans are depicted in photographs included in the first

May 16, 2019 post.

198.

The picture included in the first May 16, 2019 post ("DANGER!!! FAKE

RIGGING EQUIPMENT NOTIFICATION SOLD BY HD SUPPLY WHITE CAP

11/18/2018" Notification) states as follows:

**DANGER!!!  FAKE RIGGING EQUIPMENT NOTIFICATION SOLD BY HD SUPPLY WHITE CAP     11/18/2018**
COUNTERFEIT - Washout Pan made in SOUTH KOREA - distributed HD Supply / White Cap / Concrete Pump Supply
marketed and sold using our EXACT product numbers, safety data and pictures.

 

Authentic Washout Pan made in the USA and MX WWW.WASHOUTPAN.COM



A true and correct copy of the "DANGER!!! FAKE RIGGING

EQUIPMENT NOTIFICATION SOLD BY HD SUPPLY WHITE CAP

11/18/2018" Notification included in the first May 16, 2019 post is attached hereto as **Exhibit ZZ**.

199.

It appears the Georgia pans are depicted in photographs included in the "DANGER!!! FAKE RIGGING EQUIPMENT NOTIFICATION SOLD BY HD SUPPLY WHITE CAP 11/18/2018" Notification.

200.

As of the drafting of the original complaint filed in this matter, the first May 16, 2019 post, which specifically and directly targets a Georgia company, was still active on Mowers' LinkedIn profile and was accessible to any individual in the world via the World Wide Web, including Georgia-based clients and potential clients.

201.

On or about May 16, 2019, Mowers published the following post to his LinkedIn page (the "second May 16, 2019 post") which tagged WP's LinkedIn profile:



A true and correct copy of the second May 16, 2019 post is attached hereto

as **Exhibit AAA**.

202.

It appears the Georgia pans are depicted in photographs included in the

second May 16, 2019 post.

203.

As such, Plaintiff is informed and believes that the second May 16, 2019

post, which directly targeted a Georgia company, was placed on the LinkedIn

homepage feeds of over 10,000 of Mowers' followers, WP's followers and was

published for any person in the world to see via the World Wide Web, including

Georgia-based clients and potential clients.

204.

As of the drafting of the original complaint filed in this matter, the second

May 16, 2019 post was still active on Mowers' LinkedIn profile and was

accessible to any individual in the world via the World Wide Web, including

Georgia-based clients and potential clients.

205.

On or about May 20, 2019, Mowers published the following post to his

LinkedIn page (the "May 20, 2019 post") which tagged WP's LinkedIn profile:



A true and correct copy of the May 20, 2019 post is attached hereto as

**Exhibit BBB**.

206.

As such, Plaintiff is informed and believes that the May 20, 2019 post,

which directly targeted a Georgia company, was placed on the LinkedIn homepage

feeds of over 10,000 of Mowers' followers, WP's followers and was published for any person in the world to see via the World Wide Web, including Georgia-based clients and potential clients.

207.

As of the drafting of the original complaint filed in this matter, the May 20, 2019 post was still active on Mowers' LinkedIn profile and was accessible to any individual in the world via the World Wide Web, including Georgia-based clients and potential clients.

208.

As of at least May 23, 2019, the homepage of WP's website, which can be accessed at https://washoutpan.com/, and which solicits and accepts business from Georgia consumers, contained the following banner at the top of its page:



A true and correct copy of the homepage of WP's website as it existed on May 23, 2019 is attached hereto as **Exhibit X**.

209.

When clicking the link in the aforementioned banner, the individual visiting the WP site is directed to a page entitled "BUYER BEWARE of WASHOUTPAN™ Counterfeits," which can be accessed at the following link: https://washoutpan.com/pages/beware-of-washout-pan-counterfeits-imported-from-china , which includes a link to a document which identifies Plaintiff as the source of the alleged "China Counterfeits" described in the page entitled "BUYER BEWARE of WASHOUTPAN™ Counterfeits."

210.

Relevant excerpts of the page entitled "BUYER BEWARE of WASHOUTPAN™ Counterfeits" on WP's website are attached hereto as **Exhibit DDD**, and include the following:



HOME    ABOUT    SHOP    CONTACT    SAFETY    WARRANTY    TER

## BUYER BEWARE of WASHOUTPAN™ Counterfeits

### Protecting Customers Is a Priority for Washout Pan.

WASHOUTPAN™ is active in the fight against trade with FAKES that have entered the supply chain and are being sold by a national construction supply chain. These are of unknown quality, unauthorized and counterfeit products. They are being sold with our stolen registered copyright protected published images, exact product numbers, sizes and color to further deceive the purchaser.



HOME     ABOUT     SHOP     CONTACT     SAFETY     WARRANTY     TERMS

Counterfeit WashoutPan's are a global threat. Worst case, such fakes can endanger the safety of unsuspecting users or even be life-threatening.

On this page you will find information about how to protect yourself from buying or and using a pan that is being sold using authentic Washout Pan™ name, product images, product numbers and design features.

Based on information and belief, these counterfeits are being made in China and imported into the USA.  The original country of origin is removed and replaced as a product made in the USA.

You might be able to distinguish the original from the counterfeits by comparing the following details from the fake pans we've purchased being represented as authentic Washout Pan products:



HOME     ABOUT     SHOP     CONTACT     SAFETY     WARRANTY     TERMS

Counterfeit pictured below:  D rings has no country of origin mark and does not have a manufacturers mark or logo.
Original markings have been ground off the D rings.  Look for a flat, painted over surface where the required markings have been removed.

The DOE requires a manufacturers name, trademark, or logo to be on Hooks and shackles (Reference DOE-STD-1090-2011, TR244C Rev. 5, and ASTM B30.10)





Authentic pictured below:  *D rings are stamped USA with a rating exceeding 18,500 LBS*





Counterfeit pictured below:  Top headrail is open when viewed from underneath. Hand can be inserted into the open headrail and gasped.





Authentic pictured below: **Headrail is fully enclosed and fingers can not be placed inside.**





Counterfeit pictured below: Affixed metal equipment identification tag list all of the authentic product numbers Mableton Georgia.



Authentic pictured below: **Affixed metal equipment identification tag list WASHOUT PAN San Diego CA, Made in CA/MX.**



Authentic: **Marked with black paint on side of headrail 'MADE IN MEXICO.'**

Authentic Washout Pan™ products are engineered in Oregon. Steel is cut in California. Assembly and paint Tijuana Mexico - All North America.

Via the webpage, WP also advertises that "U.S. Congressman Duncan Hunter is backing our San Diego based company" which includes "sending a letter to the president[.]" A true and correct copy of excepts from the page entitled

"BUYER BEWARE of WASHOUTPAN™ Counterfeits" on WP's website as they existed on May 23, 2019 is attached hereto as **Exhibit EEE**.

211.

It appears the Georgia pans are depicted in photographs included in the page entitled "BUYER BEWARE of WASHOUTPAN™ Counterfeits" on WP's website.

212.

As of the drafting of the original complaint filed in this matter, the homepage of WP's website contained the banner described above, which directly targets a Georgia company, and contained the link to and the page entitled "BUYER BEWARE of WASHOUTPAN™ Counterfeits" on WP's website and was accessible to any individual in the world via the World Wide Web, including the Georgia consumers who are solicited to engage with the website.

213.

As of at least March 13, 2019, the "SAFETY WARNING" page of WP's website noted, inter alia, "Beware of known counterfeits made with lower quality components & mislabeled country of origin.  Protecting WASHOUT PAN customers is a priority."  A true and correct copy of a print out from this webpage is attached hereto as **Exhibit FFF**.

214.

96

Plaintiff is informed and believes that Defendants made additional slanderous and defamatory false statements about Plaintiff and Plaintiff's pans in person and/or via e-mail and/or text messages to Plaintiff's customers and potential customers between October 2018 and the present, the specific details of which exist in the form of evidence under the Defendants' knowledge and control to which Plaintiff does not uniquely have access to that will be acquired through discovery.  Plaintiff is informed, and therefore believes, that some of these communications were made with Georgia residents who were within the State of Georgia at the time Defendants contacted them.

215.

The statements outlined above are collectively referred to as the "false and misleading statements."

216.

The statements outlined above that were posted to LinkedIn are collectively referred to as the "false and misleading LinkedIn posts."

217.

The causes of action contained herein arise from, *inter alia*, Defendants purchase of the Georgia pans from Plaintiff on November 14, 2018 through Plaintiff's website controlled by Plaintiff's employees in Georgia, the orders of which would be processed through its Georgia headquarters, for the Georgia pans

that were originally shipped from Georgia, that were manufactured by a Limited Liability Company in Georgia.  Moreover, Defendants fraudulent efforts to dispute the charges for the Georgia pans involved the efforts of Plaintiff's employees in Georgia that work at Plaintiff's headquarters in Georgia to ultimately resolve.

218.

Additionally, Defendants took photographs of the Georgia pans and incorporated them into many of Defendants false and misleading LinkedIn posts and false and misleading statements, which were deliberate actions aimed at Plaintiff, Plaintiff's headquarters, employees, and customers within the State Georgia and this district and, as such, created continuing obligations to Georgia residents, including Plaintiff.

219.

Consequently, Defendants have availed themselves of the laws of the State of Georgia as Plaintiff's causes of action are related to the Georgia pans, and the Court may exercise jurisdiction over Defendants as it would not violate traditional notions of fair play and substantial justice.

220.

Defendants could reasonably anticipate being brought into Court in Georgia as a result of Defendants' actions described in detail above associated with the Georgia pans.

221.

Accordingly, this Court may exercise personal jurisdiction over Defendants as to all causes of action herein in the same manner as if Defendants were residents of Georgia given Defendants transacted business within Georgia.

## D. CAUSES OF ACTION

## <u>COUNT I – FALSE ADVERTISING, UNFAIR COMPETITION IN VIOLATION OF 15 U.S.C § 1125(a)(1) (AGAINST BOTH WP AND MOWERS)</u>

222.

Plaintiff incorporates by reference and re-allege each and every preceding paragraph of this complaint as if restated completely herein.

223.

Defendants have made a false or misleading description or representation of fact, in interstate commercial advertising or promotion, about both WP and Plaintiff's products.  These statements misrepresent the nature, characteristics, qualities, or geographic origin of Defendants' or Plaintiff's companies or goods.

224.

For example, Defendants have knowingly, willfully, and falsely represented and misled consumers to believe that Plaintiff has and continues to commit felony

crimes by selling its "fake/dangerous products," which disparages Plaintiff's products. For example, in the first November 17, 2019 post, Mowers publicly posted a screen-shot of an electronic receipt reflecting Defendants' purchase of Plaintiff's pan and advertised the transaction as "Blatant. Criminal. Felony Fraud." Thereafter, tagging Plaintiff, and its employee Sollenberger.

<div align="center">225.</div>

Similarly, in the second November 17, 2019 post, Mowers falsely advertised that Plaintiff's products are "going to hurt or kill somebody" which disparages Plaintiff's products, and suggested the arrest of Plaintiff's personnel as the result of Plaintiff's commission of a felony.  Again in the November 18, 2018 post, Defendants criticized the D ring stamping of Plaintiff's pan, characterizing it as "criminal" which disparages the product.

<div align="center">226.</div>

Defendants have also misrepresented and misled consumers to believe that Plaintiff's pans are illegal on the basis of not being "OSHA certified," while simultaneously misrepresenting that WP's pans are legal because they are indeed "certified."  These advertisements are false and misleading because WP's pans are not certified by OSHA, as OSHA is a state and/or federal agency which does not certify washout pan products.  In the second November 17, 2018 post, for example,

Mowers issued a false advertisement indicating that Plaintiff was selling a "fake OSHA certified pan" which disparages the product.

<div align="center">227.</div>

Another example of Defendants false advertising and product disparagement includes Defendants second November 26, 2018 post noting that "We've been informed in writing by an HD Supply HD Supply Construction & Industrial – White Cap employee that category director Jennifer Tomaszewicz and Ian Freeman have a baker deal with 'Concrete Pump Supply Georgia' to copy and counterfeit our engineer certified pans with fake documents and knowingly distribute to job sites across the United States risking injury or death. I hope the United States Attorneys' Offices criminally prosecutes everyone who made this fake product using every detail of our entire product line down to the product skus putting HD Supply and all of its customers in serious danger. Can you imagine a fully loaded pan lifted by a crane over a school bus? Put these people in Jail! Alan Sollenberger."

<div align="center">228.</div>

Another example of Defendants false advertising and product disparagement includes Defendants fifth November 26, 2018 post noting that "If you have these pans on your job site Do not use! They are fake counterfeits made by Alan Sollenberger at HD Supply using my companies skus, safety data and fake

<div align="center">101</div>

certifications – and he knew it! I bought this on their website three days ago and

usd purchase order: federal infringement."

<p style="text-align:center">229.</p>

Another example of Defendants false advertising and product disparagement

includes Defendants first December 11, 2018 post noting:



230.

Through Mowers, Defendants have also falsely advertised themselves as being a regulatory and/or workplace safety authority.  For example, the first May 16, 2019 post, is misleading titled "IMPORTANT SAFETY NOTICE – CLASS "A" HAZARD," as if it originated from a governmental authority, and falsely characterizes Plaintiff's products as "fake" and having a "strong likelihood of death or grievous injury or illness to the public[.]" Similarly, in its May 20, 2019 post, Defendants misrepresent themselves as "cracking down on counterfeit Washout Pan products[.]"

231.

Defendants have also falsely advertised that their products are "backed" and thereby, supported, endorsed, or approved, by governmental actors and regulatory agencies, including United States Congressman Duncan Hunter (*see* Ex. R), the Denver City Counsel (*see* Ex. T) OHSA (*see* Ex. W) the U.S. Attorney's Office (*see* Ex. W), the Office of Trade (*see* Ex. X) the U.S. Customs & Border Protection (*see* Ex. X).  On information and belief, no governmental entity or actor has approved, sponsored, endorsed, or otherwise "backed" Defendants' or its products.

232.

Moreover, Defendants have falsely advertised that these governmental actors have "escalated the mater" to OSHA and prosecutorial authorities.  On information

and belief, there is in fact no pending investigation by any governmental authority or prosecutor into Plaintiff's pans.  Finally, Defendants have also falsely advertised that Congressman Hunter has written a letter to President Trump on behalf of WP and against Plaintiff's pans.  On information and belief, no such letter has been sent by Congressman Hunter to President Trump regarding WP's allegations against Plaintiff's pans.[5]

<div align="center">233.</div>

Defendants' false and misleading statements set forth above[6] are false and misleading for a litany of reasons, including but not limited to, Defendants repeated use of the word "counterfeit" in describing the pans sold by Plaintiff.  For example, in the first November 18, 2018 post, Defendants criticized the D ring stamping of Plaintiff's pan, characterizing it as "counterfeit."  Similarly, in Defendants' "Crane & Rigging job-site safety alert," they have again repeatedly characterized Plaintiff's pans as "counterfeit."  Defendants also falsely characterized Plaintiff's products as "counterfeit" in the second November 18, 2018 post, the third November 17, 2018 post, the fourth November 18, 2018 post, the sixth November 18, 2018 post, the first November 26, 2018 post, the second

---

[5] Congressman Hunter regularly issues eNewsletters and press releases via his offices website (https://hunter.house.gov), including letters which *have* been sent to President Trump (*See* https://hunter.house.gov/sites/hunter.house.gov/files/documents/POTUS.Gallagher.010719.pdf), and there is no indication of any actions taken by Congressman Hunter as advertised by Defendants.

[6] Plaintiff's allegations of false advertising are not limited to the examples directly provided in this first cause of action.

November 26, 2018 post, the fifth November 26, 2018 post, May 20, 2019 post.

However, Plaintiff's pans are not and *cannot* be counterfeit.

234.

Pursuant to  15 U.S.C. § 1116(d)(1)(B) the term "counterfeit mark" means:

> (i) a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use, whether or not the person against whom relief is sought knew such mark was so registered; or

> (ii) a spurious designation that is identical with, or substantially indistinguishable from, a designation as to which the remedies of this chapter are made available by reason of section 220506 of title 36;

> but such term does not include any mark or designation used on or in connection with goods or services of which the manufacture [1] or producer was, at the time of the manufacture or production in question authorized to use the mark or designation for the type of goods or services so manufactured or produced, by the holder of the right to use such mark or designation.

235.

However, Defendants do not own a trademark for WASHOUT PAN "that is registered on the principal register in the United States Patent and Trademark Office for such goods" as required by statute. Because "counterfeiting is limited to marks registered on the principal register of the United States Patent and Trademark Office," and because Defendants do not have a trademark registration, the characterization of Plaintiff's products as "counterfeit" is necessarily false. *See* Gilson on Trademarks § 5.19 (2019). Accordingly, Defendants' statements set

forth above which used the word "counterfeit" to describe pans sold by Plaintiff were false, misleading and constitute false advertising as Plaintiff has never sold a pan with a counterfeit mark.

<div align="center">236.</div>

As set forth above, Defendants' false and misleading statements were made for the purpose of influencing consumers to purchase Defendants' goods and were disseminated sufficiently to the relevant purchasing public to constitute commercial advertising and promotion.

<div align="center">237.</div>

As set forth above, Defendants have made false and misleading statements disparaging Plaintiff's products in commercial advertising and promotion to Plaintiff's customers and potential customers concerning Plaintiff's products.

<div align="center">238.</div>

Defendants' false and misleading statements, as set forth above, confuse and deceive, or have the tendency to, and are likely to confuse and deceive an appreciable number of relevant consumers, customers, and members in the applicable industry and had a material effect on purchasing decisions.

<div align="center">239.</div>

Defendants knew or should have known that its false and misleading statements were, indeed, false.

240.

Defendants' false and misleading statements, as set forth above, were deceptive.

241.

Defendants' false and misleading statements, as set forth above, were used in interstate commerce.

242.

Defendants' false and misleading statements, as set forth above, have diverted, do divert, and will continue to divert sales to Defendants' products, at the expense of Plaintiff's products, and have lessened, are lessening, and, if not enjoined, will continue to lessen the goodwill enjoyed by Plaintiff.

243.

Defendants' false and misleading statements, as set forth above, constitute false and misleading advertising and unfair competition in violation of the Section 43(a)(1) of the Lanham Act, 15 U.S.C. § 1125(a)(1).

244.

Defendants' false and misleading statements, as set forth above, have deceived and, unless restrained, will continue to deceive the public, including consumers, and have injured and will continue to injure Plaintiff and the public, including consumers and retailers, causing damage to Plaintiff, in an amount to be

determined at trial, and other irreparable injury to the goodwill and reputation of Plaintiff.

245.

Defendants' false and misleading statements, as set forth above, were willful, intentional, and egregious, and make this an exceptional case within the meaning of 15 U.S.C. § 1117(a).

246.

Plaintiff has no adequate remedy at law to compensate it for all the damages Defendants' wrongful acts have and will continue to cause.  WP and Mowers are liable for false advertising under the Lanham Act. As alleged herein, Mowers actively and knowingly caused the unlawful conduct, and as a result is personally liable as the moving, conscious force behind WP's false advertising.

## COUNTS II & III – DEFAMATION/LIBEL PER QUOD AND DEFAMATION/LIBEL PER SE (AGAINST BOTH WP AND MOWERS)

247.

Plaintiff incorporates by reference and re-allege each and every preceding paragraph of this complaint as if restated completely herein.

248.

O.C.G.A. § 51-5-1 provides that:

(a)  A libel is a false and malicious defamation of another, expressed in print, writing, pictures, or signs, tending to injure the reputation of the person and exposing him to public hatred, contempt, or ridicule.

(b) The publication of the libelous matter is essential to recovery.

### 249.

To be considered defamation "per se", the words used are those which are recognized as injurious on their face. O.C.G.A. § 51-5-1 *et al*.

### 250.

There is no prohibition against a business entity bringing a defamation suit when its business reputation is harmed.  Pacific & S. Co. v. Montgomery, 233 Ga. 175 (1974).

### 251.

The false and misleading statements published by Defendants assassinated Plaintiff's character and damaged its reputation.

### 252.

The false and misleading statements published by Defendants convey a grossly inaccurate and false impression of Plaintiff and its products.

### 253.

The false and misleading statements published by Defendants were motivated by Defendants' desire to profit from those statements.

### 254.

The false and misleading statements published by Defendants accuse Plaintiff of disregarding the health and safety of its customers utilizing its products, as well as the general public.

255.

As a result of the false and misleading statements published by Defendants, Defendants cross the threshold from speech protected by the First Amendment to enter the arena of actionable defamation for which it must be held legally accountable.

256.

Defendants are at fault as they acted at the very least with ordinary negligence in making the false and misleading statements as Defendants failed to exercise ordinary care when they published the false and misleading statements.

257.

Defendants false and misleading statements were unprivileged because, *inter alia*, the statements were not made in good faith, were not limited in scope, were not made on a proper occasion and were not published to the proper persons.

a.        **FALSE STATEMENTS**

258.

The false and misleading statements contain a litany of representations that can be proven false, which include, but are not limited to the following:

259.

The October 18, 2018 post was published to the public and included, but is not limited to, the following false and misleading statements which contain statements that can be proven false: "Please be aware our engineer certified pans are being falsely marketed and sold with our photographs, videos, product title, description and OSHA engineering calculation packets by HD Supply Construction & Industrial – White Cap Alan Sollenberger.  These copy cat pans sold by HD Supply Construction & Industrial – White Cap are not certified and can result in injury or death."

260.

The November 17, 2018 post was published to the public and included, but is not limited to, the following false and defamatory statement, which can be proven false: "Blatant. Criminal. Felony Fraud. Alan Sollenberger! HD Supply HD Supply Construction & Industrial – White Cap United States Attorneys' Offices."

261.

The statement that Plaintiff or its executives are "Criminal" is clearly injurious on its face.

262.

The statement that Plaintiff or its executives have committed "Felony Fraud" is clearly injurious on its face, as it is a specific crime punishable by law.

263.

Additionally, as Plaintiff is in a profession that requires a positive image to its customers and prospective customers, calling Plaintiff a "Criminal" and that it has committed "Felony Fraud" is clearly injurious to its profession.

264.

The statements that Plaintiff is a "Criminal" and that it has committed "Felony Fraud" is couched in language that would lead a third party to believe this statement, which is patently false.

265.

The fifth November 18, 2018 post was published to the public and included, but is not limited to, the following false and defamatory statement, which can be proven false: "Everyone in the sales process is criminally liable" for violating the "Trademark Counterfeiting Act of 1984."

266.

The statement that Plaintiff or its employees involved in the sales process are "criminally liable" for violating the "Trademark Counterfeiting Act of 1984" is clearly injurious on its face.

267.

Additionally, as Plaintiff is in a profession that requires a positive image to its customers and prospective customers, saying Plaintiff or its employees involved

in the sales process are "criminally liable" for violating the "Trademark Counterfeiting Act of 1984" is clearly injurious to its profession.

268.

The statements that Plaintiff or its employees involved in the sales process are "criminally liable" for violating the "Trademark Counterfeiting Act of 1984" is couched in language that would lead a third party to believe this statement, which is patently false.

269.

The second November 17, 2018 post was published to the public and included, but is not limited to, the following false and defamatory statement, which can be proven false: "This fake OSHA certified pan using our specifications was created by Alan Sollenberger at HD Supply Construction & Industrial – White Cap and is being lifted over the public's lives and is going to hurt or kill someone. How do we get these people arrested? This is a felony."

270.

The statement that Plaintiff is committing a felony is clearly injurious on its face.

271.

Additionally, as Plaintiff is in a profession that requires a positive image to its customers and prospective customers, stating that Plaintiff is committing a felony is clearly injurious to its profession.

272.

The statements that Plaintiff is committing a felony is couched in language that would lead a third party to believe this statement, which is patently false.

273.

The November 18, 2018 post was published to the public and included, but is not limited to, the following false and defamatory statement which can be proven false: "Is this a USA stamped and rated D ring? No! Where is the recall? Alan Sollenberger United States Attorneys' Offices Cal Osha HD Supply HD Supply Construction & Industrial – White Cap? Fake! Counterfeit. Willful infringement. Criminal."

274.

The statement that Plaintiff is a "Criminal" is clearly injurious on its face.

275.

Additionally, as Plaintiff is in a profession that requires a positive image to its customers and prospective customers, calling Plaintiff a "Criminal" is clearly injurious to its profession.

276.

The statements that Plaintiff is a criminal is couched in language that would lead a third party to believe this statement, which is patently false.

277.

The December 9, 2018 "CRANE & RIGGING JOB-SITE SAFETY ALERT" that Plaintiff is informed and believes was published to the public, included, but is not limited to, the following false and defamatory statement, which can be proven false: "Washout Pan has identified HD Supply White Cap Construction Supply who continues to knowingly selling [sic] counterfeit steel 'rated' Washout Pans…."

278.

The statement that Plaintiff, a professional and respected supplier and seller of products, is "knowingly selling counterfeit" products is clearly injurious on its face.

279.

Additionally, as Plaintiff is in a profession of selling and distributing products, that requires a positive image to is customers and prospective customers, stating that Plaintiff is "knowingly selling counterfeit" products is clearly injurious to its profession.

280.

The statements that Plaintiff is "knowingly selling counterfeit" products is couched in language that would lead a third party to believe this statement, which is patently false.

281.

The first May 9, 2019 post allegedly containing a photo of Plaintiff's product was published to the public and included, but is not limited to, the following false and defamatory statement which can be proven false: "Don't forget about the IRS for tax evasion and most importantly the RICO act when multiple companies collude."

282.

The statement that Plaintiff is being charged with tax evasion or a RICO violation is clearly injurious on its face.

283.

Additionally, as Plaintiff is in a profession that requires a positive image, stating that Plaintiff is being charged with tax evasion or a RICO violation is clearly injurious to its profession.

284.

The statements that Plaintiff is being charged with tax evasion or a RICO violation is couched in language that would lead a third party to believe this statement, which is patently false.

285.

The first May 16, 2019 post containing a photo of the "DANGER!!! FAKE

RIGGING EQUIPMENT NOTIFICATION SOLD BY HD SUPPLY WHITE

CAP" which included photos of Plaintiff's products was published to the public

and included, but is not limited to, the following false and defamatory statement,

which can be proven false: "IMPORTANT SAFETY NOTICE – CLASS 'A'

HAZARD, A SERIOUS VIOLATION."

286.

The "DANGER!!! FAKE RIGGING EQUIPMENT NOTIFICATION

SOLD BY HD SUPPLY WHITE CAP 11/18/2018" Notification published by

Defendants included, but is not limited to, the following false and defamatory

statement which can be proven false: "COUNTERFEIT – Washout Pan made in

SOUTH KOREA - distributed HD Supply / White Cap / Concrete Pump

Supply…."

287.

The first May 16, 2019 and May 20, 2019 posts allegedly containing a photo

of Plaintiff's product was published to the public and included, but is not limited

to, the following false and defamatory statement which can be proven false:

"counterfeits."

288.

Defendants' website, which specifically includes photos of Plaintiff's product and a link that specifically identifies Plaintiff, was published to the public and included, but is not limited to, the following false and defamatory statement, which can be proven false: "WASHOUTPAN™ is active in the fight against trade with FAKES that have entered the supply chain and are being sold by a national construction supply chain.  These are of unknown quality, unauthorized and counterfeit products. […] Counterfeit WashoutPan's are a global threat. Worst case, such fakes can endanger the safety of unsuspecting users or even be life-threatening."

289.

More generally, the false and misleading statements frequently charge that Plaintiff is guilty of multiple crimes, dishonesty and immorality and as a result, the false and misleading statements are libelous per se.

290.

More generally, the false and misleading statements are injurious to Plaintiff's business and as a result, the false and misleading statements are libelous per se.

291.

The false and misleading LinkedIn posts by Defendants specifically referenced Plaintiff and/or were of and concerning Plaintiff, who operates its

principle place of business and headquarters in Atlanta, Georgia, and were accessible to any individual in the State of Georgia, including this district. Some of the false and misleading LinkedIn posts specifically referenced Plaintiff's Chief Operating Officer, who is also a Georgia resident. Defendants' false and misleading LinkedIn posts were in-fact accessed and read by individuals within the State of Georgia and this district. When the false and misleading statements were posted on LinkedIn by Defendants and were then accessed by a third party within the State of Georgia, the material was "published" in Georgia and the Defendants have communicated the false and misleading statements published on LinkedIn by Defendants into Georgia.

<div align="center">292.</div>

Further, by tagging Plaintiff, Plaintiff's affiliates and Plaintiff's COO in the false and misleading statements published on LinkedIn, Defendants were purposefully directing the false and misleading statements: to Plaintiff's headquarters in Georgia, to Plaintiff's employees in Georgia, and to Plaintiff's LinkedIn followers, which include its customers within the State of Georgia.

<div align="center">293.</div>

The acts and conduct by defendants were designed to dramatize false allegations for its own profit, and defendants did fail to exercise due care to prevent such defamation.

<div align="center">119</div>

294.

**b.**        **ACTUAL MALICE**

As Plaintiff is not a public figure, it is not required to show actual malice to recover damages as a result of Defendants' defamation/libel.  However, in publishing the false and misleading statements about Plaintiff and its products, Defendants abandoned its integrity and ignored fundamental principles of decency and civility by publishing false and defamatory accusations with actual malice.

295.

Evidencing a reckless disregard for truth or falsity, Defendants knowingly and purposely avoided the truth and ignored evidence establishing the falsity of the published statements made by Defendants described herein.

296.

Evidencing a reckless disregard for truth or falsity, Defendants published accusations against Plaintiff that were so inherently improbable on their face as to raise serious doubts about their truth.

297.

Evidencing a reckless disregard for truth or falsity, Defendants published accusations against Plaintiff that were so outrageous on their face as to raise serious doubts about their truth.

298.

Evidencing a reckless disregard for truth or falsity, Defendants published accusations against Plaintiff that clearly contradicted known facts.

299.

### i.      Defendants Refused to Cease and Desist – and instead doubled-down on the false and misleading statements

Despite Plaintiff's attempt to informally resolve this matter by demanding Defendants cease and desist publishing false and misleading statements regarding Plaintiff, Defendants have wholly failed to correct their defamatory statements and instead doubled-down on them by continuing to repeatedly publish defamatory statements over the ensuing months that continue to this very day, thereby greatly expanding the audience that saw them and magnifying the damage to Plaintiff.

300.

Moreover, Defendants have willfully and maliciously kept their LinkedIn posts and pages on WP's website regarding Plaintiff publicly available online to this very day.

301.

Defendants had actual knowledge that the accusations against Plaintiff were false as outlined in Plaintiff's cease and desist letter, yet Defendants continued to repeatedly publish defamatory statements over the ensuing months thereafter,

greatly expanding the audience that saw them and magnifying the damage to Plaintiff.

<div align="center">302.</div>

### c. Damages

The false and misleading statements were published by Defendants to third parties and were, in fact, viewed by third parties in Georgia and across the United States.

<div align="center">303.</div>

The false and misleading statements published by Defendants were of and concerning Plaintiff and its employees in Georgia.  Additionally, at all relevant times and prior to publication of the false and misleading statements, it was well known to Defendants that Sollenberger was employed as Plaintiff's Chief Operating Officer and was ultimately responsible for the oversight and administration of Plaintiff.  As such, Defendants were well aware that attacks on Plaintiff, as well as Sollenberger, would be viewed by the public and members of the industrial community as attacks on the professionalism, ethics and integrity of Plaintiff.

<div align="center">304.</div>

As a direct and proximate result of the false and misleading statements published by Defendants, Plaintiff's reputation has been permanently damaged.

305.

As a direct and proximate result of the false and misleading statements published by Defendants, Plaintiff has suffered public hatred, contempt, scorn, and ridicule.

306.

As a direct and proximate result of the false and misleading statements published by Defendants, Plaintiff has suffered special damages that occurred in Georgia in the form of lost sales and profits.

307.

As a direct and proximate result of the false and misleading statements published by Defendants, the public has viewed Plaintiff in a negative and shameful light.

308.

As set forth above, the false and misleading statements published by Defendants are defamatory and libelous per se entitling Plaintiff to presumed damages.

309.

The conduct of Defendants demonstrates willful misconduct and an entire want of care that raises a conscious indifference to consequences.

310.

Defendants published false and misleading statements with actual malice thereby entitling Plaintiff to an award of punitive damages.

311.

Plaintiff is also entitled to an award of punitive damages from Defendants in order to punish it for its unlawful conduct and to penalize and deter it from repeating such unlawful and egregious conduct.

312.

Plaintiff has been damaged by Defendants false and misleading statements, and thus Defendants are liable for defamation per quod and defamation per se.

## COUNTS IV & V – SLANDER PER QUOD AND SLANDER PER SE (AGAINST WP AND MOWERS)

313.

Plaintiff incorporates by reference and re-allege each and every preceding paragraph of this complaint as if restated completely herein.

314.

O.C.G.A. § 51-5-4 provides that:

(a)  Slander or oral defamation consists in:
(1)  Imputing to another a crime punishable by law;
(2)  Charging a person with having some contagious disorder or with being guilty of some debasing act which may exclude him from society;
(3)  Making charges against another in reference to his trade, office, or profession, calculated to injure him therein; or

(4)  Uttering any disparaging words productive of special damage which flows naturally therefrom.

315.

Further, defamation upon one's trade or profession constitutes slander per se, [and] must be one that is especially injurious to the Plaintiff's reputation… [the words] must be of such a nature such as to charge him with some defect of character...to affect his competency successfully to carry on his profession. Cottrell v. Smith, 299 Ga. 517 (2016).

316.

Between January and April of 2019, Mowers personally appeared on no less than three separate occasions at multiple construction sites of general contractor Adolfson & Peterson Construction, who is a customer of Plaintiff that purchased and was using Plaintiff's pans on its jobsites.  On Mowers' first construction site appearance, he fraudulently impersonated an OSHA inspector, representing himself to employees of Adolfson & Peterson Construction as an employee of OSHA.  During this first appearance while Mowers was fraudulently impersonating an OSHA inspector, he made slanderous false oral statements to employees of Adolfson & Peterson Construction with respect to Plaintiff and/or Plaintiff's pans that were on the jobsite, including but not limited to: that Plaintiff's pans were not certified; that Adolfson & Peterson Construction's use of the pans could result in death; and that Adolfson & Peterson Construction could face

punishment by OSHA (i.e., through citations and/or violations) by continuing its use of Plaintiff's pans on the construction site. During his second and third construction site visits, Mowers continued to make slanderous false statements to employees of Adolfson & Peterson Construction with respect to Plaintiff's pans that were on the jobsite and told them that he was actually not employed by OSHA, but was rather the owner of WP, and was there in an effort to sell Adolfson & Peterson Construction pans manufactured by WP.

317.

As a result of Mowers fraudulently impersonating an OSHA inspector, and the slanderous and defamatory false statements he made to employees of Adolfson & Peterson Construction with respect to Plaintiff and Plaintiff's pans, Adolfson & Peterson Construction contacted Plaintiff's Atlanta headquarters requesting to return Plaintiff's pans and Adolfson & Peterson Construction also requested a refund for these products from Plaintiff's Atlanta headquarters.

318.

Statements Mowers personally stated to employees at the construction sites of general contractor Adolfson & Peterson Construction included, but were not limited to, the following false and defamatory statement, which can be proven false: that Adolfson & Peterson Construction could face punishment by OSHA by

continuing its use of Plaintiff's pans on the construction site while Mowers impersonated a government employee, an OSHA inspector.

319.

The statement that Adolfson & Peterson Construction could face punishment by OSHA by continuing its use of Plaintiff's pans on the construction site while Mowers impersonated an OSHA inspector is clearly injurious on its face.

320.

The statement that Adolfson & Peterson Construction could face punishment by OSHA by continuing its use of Plaintiff's pans on the construction site while Mowers impersonated an OSHA inspector is couched in language that would lead an Adolfson & Peterson Construction employee to believe this statement, which is patently false.

321.

Additionally, as Plaintiff is in a profession that requires a positive image to its customers and prospective customers, the statement that Adolfson & Peterson Construction could face punishment by OSHA by continuing its use of Plaintiff's pans on the construction site while Mowers impersonated an OSHA inspector, is clearly injurious to its profession.

322.

As a result of Mowers' fraudulently impersonating an OSHA inspector, and the defamatory false statements he made to employees of Adolfson & Peterson Construction with respect to Plaintiff and/or Plaintiff's pans, Mowers destroyed Plaintiffs' reputation and business relationship with its customer Adolfson & Peterson Construction.

323.

The slanderous false statements made by Mowers to employees of Adolfson & Peterson Construction, were especially injurious to Plaintiff's reputation as, *inter alia*, the statements affected Adolfson & Peterson Construction's belief in Plaintiff's competency to successfully carry on its profession.

324.

The slanderous false statements made by Mowers that he was an OSHA inspector and that in such a capacity as an inspector, Adolfson & Peterson Construction's continued use of Plaintiff's products could result in punishment from OSHA, were especially injurious to Plaintiff's reputation as, *inter alia*, the statements affected Adolfson & Peterson Construction's belief in Plaintiff's competency to successfully carry on its profession.

325.

Plaintiff is informed and believes that Defendants made slanderous false oral statements about Plaintiff and Plaintiff's products at a construction related trade

show to Plaintiff's customers and potential customers between January and April of 2019, the specific details of which exist in the form of evidence under the Defendants' knowledge and control to which Plaintiff does not uniquely have access to that will be acquired through discovery.

326.

Plaintiff is informed and believes that between January and May of 2019, Mowers personally appeared on at least one construction site of commercial concrete contractors The Conco Companies, a customer of Plaintiff, that purchased and was using Plaintiff's pans on its construction site.  While on the construction site of The Conco Companies, Plaintiff is informed and believes that Mowers made slanderous oral false statements to employees of The Conco Companies with respect to Plaintiff and/or the Plaintiff's pans that were on the jobsite, the specific details of which exist in the form of evidence under the Defendants' knowledge and control to which Plaintiff does not uniquely have access to that will be acquired through discovery.

327.

Mowers aforementioned actions with The Conco Companies destroyed Plaintiffs' reputation and prospective business relationship with its customer, The Conco Companies.

328.

Plaintiff is informed and believes that Defendants made additional slanderous oral false statements about Plaintiff and Plaintiff's products in person and/or telephone communications to Plaintiff's customers and potential customers between October 2018 and the present, the specific details of which exist in the form of evidence under the Defendants' knowledge and control to which Plaintiff does not uniquely have access to that will be acquired through discovery.

329.

The statements outlined above in paragraphs 173 through 185 made by Defendants between October 18, 2018 to the present are collectively referred to as the "false and slanderous oral statements."

330.

The false and slanderous oral statements published by Defendants convey a grossly inaccurate and false impression of Plaintiff and its products.

331.

The false and slanderous oral statements published by Defendants were motivated by Defendants' desire to profit from those statements.

332.

The false and slanderous oral statements published by Defendants accuse Plaintiff of disregarding the health and safety of its customers utilizing its products and the general public.

333.

As a result of the false and slanderous oral statements published by Defendants, Defendants cross the threshold from speech protected by the First Amendment to enter the arena of actionable slander for which they must be held legally accountable.

334.

Defendants false and slanderous oral statements were unprivileged because, *inter alia*, the statements were not made in good faith, were not limited in scope, were not made on a proper occasion and were not published to the proper persons.

335.

In publishing the false and slanderous oral statements about Plaintiff and its products, Defendants abandoned their integrity and ignored fundamental principles of decency and civility by publishing false and slanderous accusations with actual malice.

336.

Evidencing a reckless disregard for truth or falsity, Defendants knowingly and purposely avoided the truth and ignored evidence establishing the falsity of the published statements made by Defendants described herein.

337.

Evidencing a reckless disregard for truth or falsity, Defendants published accusations against Plaintiff that were so inherently improbable on their face as to raise serious doubts about their truth.

338.

Evidencing a reckless disregard for truth or falsity, Defendants published accusations against Plaintiff that clearly contradicted known facts.

339.

Despite Plaintiff's attempt to informally resolve this matter by demanding Defendants cease and desist publishing false statements regarding Plaintiff, Defendants have wholly failed to correct their slanderous statements and instead doubled-down on them by continuing to repeatedly publish defamatory statements over the ensuing months, thereby greatly expanding the audience that heard them and magnifying the damage to Plaintiff.

340.

Moreover, Plaintiff has willfully and maliciously continued making false and slanderous statements through the present.

341.

Defendants had actual knowledge that the accusations against Plaintiff were false as outlined in Plaintiff's cease and desist letter, yet Plaintiff continued to repeatedly publish defamatory statements over the ensuing months after receiving

the letter, greatly expanding the audience that saw them and magnifying the damage to Plaintiff.

344.

The false and slanderous oral statements were published by Defendants to third parties and were, in fact, viewed by third parties all across the United States.

343.

The false and slanderous oral statements published by Defendants were of and concerning Plaintiff.

344.

As a direct and proximate result of the false and slanderous oral statements published by Defendants, Plaintiff's reputation has been permanently damaged.

345.

As a direct and proximate result of the false and slanderous oral statements published by Defendants, Plaintiff has suffered public hatred, contempt, scorn, and ridicule.

346.

As a direct and proximate result of the false and slanderous oral statements published by Defendants, Plaintiff has suffered special damages that occurred in Georgia, including but not limited to, refunds issued from Plaintiff's headquarters

within the State of Georgia from the return of pans originally purchased by Adolfson & Peterson Construction.

347.

As a direct and proximate result of the false and slanderous oral statements published by Defendants, the public has viewed Plaintiff in a negative and shameful light.

348.

As set forth above, the false and slanderous oral statements published by Defendants are defamatory and libelous per se entitling Plaintiff to presumed damages.

349.

The conduct of Defendants demonstrates willful misconduct and an entire want of care that raises a conscious indifference to consequences.

350.

Defendants published false and slanderous oral statements with Constitutional actual malice thereby entitling Plaintiff to an award of punitive damages.

351.

Plaintiff has been damaged by Defendants false and slanderous oral statements, and thus Defendants are liable for defamation per quod and defamation per se.

## COUNTS VI – TORTIOUS/INTENTIONAL INTERFERENCE WITH
## BUSINESS RELATIONS
## (AGAINST BOTH WP AND MOWERS)

352.

Plaintiff incorporates by reference and re-allege each and every preceding paragraph of this complaint as if restated completely herein.

353.

To support a verdict for tortious interference with business relations the evidence must show the defendant "(1) acted improperly and without privilege, (2) purposely and with malice with the intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with the plaintiff, and (4) for which the plaintiff suffered some financial injury." (Citation and punctuation omitted.)  Arford v. Blalock, 199 Ga. App. 434, 440 (1991)

354.

"'The term malicious, used in this connection is to be given a liberal meaning. The act is malicious when the thing done is with the knowledge of Plaintiff's rights, and with the intent to interfere therewith.' (Citation and

punctuation omitted.) '[T]he term 'malicious' or 'maliciously' means any unauthorized interference, or any interference without legal justification or excuse. Personal ill will or animosity is not essential.'"  (Citation and punctuation omitted.) Arford, supra, at p. 441.

355.

As set forth above, Defendants acted improperly and without privilege against the interests of and to the detriment of Plaintiff by Defendants making false, defamatory and slanderous statements and false advertising.

356.

As set forth above, Defendants acted purposely and with malice with the intent to injure Plaintiff by making false, defamatory and slanderous statements and false advertising.

357.

As set forth above, Defendants induced third parties not to enter into or continue a business relationship with Plaintiff, including but not limited to, Defendants' intentional interference with Plaintiff's existing business relationships with The Conco Companies and Adolfson & Peterson Construction.

358.

The breach of business relationships by and between Plaintiff and third parties, including but not limited to The Conco Companies and Adolfson &

Peterson Construction, was both expected and anticipated by Defendants as a result of Defendants making false, defamatory and slanderous statements and false advertising as set forth above.

<div align="center">359.</div>

Defendants' tortious conduct proximately caused damage to Plaintiff, including, but not limited to, Plaintiff specifically losing the profit and business of the prior sales of its pans to Adolfson & Peterson Construction after Adolfson & Peterson Construction returned the pans it purchased from Plaintiff as a result of Defendants' tortious interference with business relations.

<div align="center">360.</div>

As a direct and proximate result of Defendants' tortious conduct, Plaintiff has suffered economic detriment and damage and Defendants are liable to Plaintiff for Intentional/Tortious Interference with Business Relations.

<div align="center">

**COUNT VII – UNIFORM DECEPTIVE TRADE PRACTICES ACT**

**(AGAINST BOTH WP AND MOWERS)**

361.

</div>

Plaintiff incorporates by reference and re-allege each and every preceding paragraph of this complaint as if restated completely herein.

<div align="center">362.</div>

O.C.G.A. § 10-1-372 provides in relevant part that:

(a)  A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he:

[…]

(8)  Disparages the goods, services, or business of another by false or misleading representation of fact;

[…]

(12) Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

363.

Defendants' conduct, as outlined above, including but not limited to, making false, misleading, defamatory and slanderous representations of fact and false advertising disparaged the goods, services and business of Plaintiff constitutes a deceptive trade practice in violation of O.C G A § 10-1-370, *et seq*.

364.

Defendants' conduct, as outlined above, including but not limited to, making false, misleading, defamatory and slanderous representations of fact and false advertising disparaged the goods, services and business of Plaintiff is causing actual confusion and misunderstanding on the part of Plaintiff's customers and potential customers.

365.

Defendants' conduct is creating damage, and a likelihood of further damage to Plaintiff, including but not limited to, Plaintiffs' relationship with its customers and prospective customers.

<center>366.</center>

Plaintiff is a "person" being injured by Defendants' deceptive trade practice as defined in Georgia's Uniform Deceptive Trade Practices Act, O.C.G.A § 10-1-371(5).

<center>367.</center>

Defendants' violation of Georgia's Uniform Deceptive Trade Practices Act entitles Plaintiff to injunctive relief under O.C.G.A. § 10-1-373(a).

<center>368.</center>

Defendants willfully engaged in these trade practices knowing them to be deceptive, thereby also entitling Plaintiff to recover attorney's fees and costs under O.C.G.A. § 10-1-373(b).

<center>**COUNT VIII – FEDERAL RICO**</center>

<center>**(AGAINST MOWERS ONLY)**</center>

<center>369.</center>

Plaintiff incorporates by reference and re-allege each and every preceding paragraph of this complaint as if restated completely herein.

<center>370.</center>

<center>139</center>

At all relevant times, Mowers is a person within the meaning of 18 U.S.C. §1961 (3).

371.

At all relevant times, WP is an enterprise within the meaning of 18 U.S.C. §1961 (4).

372.

This enterprise, WP, is an entity that engaged in and is currently engaging in activity affecting interstate commerce and at all times, Plaintiff is informed and believes that WP was and is devoted to the common purpose of making money from repeated criminal activity, and protecting that money by any means necessary, which are part of WP's regular way of doing business.

373.

Mowers participated, engaged in, maintains an interest in, and controlled the operation and management of each aspect of the enterprise, WP, and conducted its affairs through an open and ongoing pattern of unlawful activity within the meaning of 18 U.S.C. §§ 1961(1)A, 1961(1)B, 1962(c), 18 U.S.C. § 1343, O.C.G.A. § 16-4-1 and 18 U.S.C. §§ 1951 (the Hobbs Act).

374.

From 2018 through the present, Mowers was employed by, associated with, and profited from conduct and activities engaged in or affected interstate

commerce and conducted or participated, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity which affected interstate commerce in violation of 18 U.S.C. § 1961, et seq.  Defendants' racketeering activity evidences and indicates a threat of continuing activity.

375.

The fundamental elements of Mowers' racketeering activity of extortion and wire fraud to obtain Plaintiff's property was that Plaintiff was forced with: (1) the fear of threatened criminal prosecution; (2) the wrongful threat of force and/or violence; (3) the fear of threatened OSHA fines/penalties; (4) fear of economic loss associated with damage to its reputation and goodwill, OSHA fines/penalties and the sale of its current pan products; and/or (5) the wrongful threat of fear of catastrophic consequences to Plaintiff's customers using the pans it sold.  Mowers possessed a fraudulent intent while engaging in such unlawful activities.

376.

The property sought or ultimately obtained by Mowers from Plaintiff as a result of the schemes were: (1) Plaintiff's right to solicit the sale of pans that compete with WP's pans; (2) Plaintiff's business (as a supplier of products) associated with sales of WP's pans to eliminate any such competition from Plaintiff; (3) money from the sale of WP's pans that was diverted from sales that would have occurred with Plaintiff through the sale of pans it sold. Mowers knew

all of the aforementioned property would be derived from unlawful activity.

Moreover, the goals of Mowers' schemes have the potential to extend to Plaintiff's

affiliates, partners, subsidiaries, their employees, in addition to the manufacturer of

the pans now sold by Plaintiff.

<div align="center">377.</div>

Mowers conducted and/or participated in a systematic and ongoing pattern

of racketeering activity that not only poses a threat of continued criminal activity,

but is actually continuing to this very day, and has continued over a significant and

substantial amount of time that has consisted of and included related predicate acts

of: (1) extortion in violation of 18 U.S.C. § 1951(a); (2) theft by extortion and (3)

wire fraud in violation of 18 U.S.C. § 1341 through a pattern of distinct predicate

acts, each of which constitute a separate violation of the aforementioned statues,

which combine to show continuity and a relationship.

<div align="center">**EXTORTION**</div>

<div align="center">378.</div>

"[I]f an individual gains control over the use of a competitor's business asset,

even if the asset is as intangible as the right to solicit business, that person has

obtained the property of another within the meaning of the Hobbs Act. The

individual that gains control over the use of a competing business's asset does more

than coerce by restricting the competing business's freedom of action. That person

<div align="center">142</div>

extorts by acquiring something of value that can be exercised to his benefit."

Dooley v. Crab Boat Owners Ass'n, 271 F. Supp. 2d 1207, 1213 (N.D. Ca 2003).

379.

After learning Plaintiff was selling a product that competed with Defendants, Mowers knowingly and intentionally committed, attempted to commit, and/or aided and abetted the commission of the crime of extortion in violation of 18 U.S.C. § 1951(a) by, having devised schemes or artifice to obtain the property from another, Plaintiff, with its consent, induced by wrongful use of threatened force, violence and fear.

380.

i.    Predicate Act Number One

Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of extortion in violation of 18 U.S.C. § 1951(a) by, having devised schemes or artifice to obtain the money and property from another, Plaintiff, with its consent, induced by wrongful use of fear at some time on or about October 18, 2019 when Mowers sent the October 18, 2018 email to Joice.

381.

Accordingly, the October 18, 2018 email is the result of Mowers' schemes to obstruct and affect articles in commerce, in violation of 18 U.S.C. § 1951(a), by using fear in threatening criminal consequences should WP not obtain the property

of Plaintiff - its business associated with pan sales and its right to solicit the sale of pans that compete with Defendants.

382.

ii.      Predicate Act Number Two

Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of extortion in violation of 18 U.S.C. § 1951(a) by, having devised schemes or artifice to obtain the money and property from another, Plaintiff, with its consent, induced by wrongful use of fear at some time on or about October 18, 2019 when Mowers sent the October 18, 2018 texts to Freeman and Tomaszewicz.

383.

Accordingly, the October 18, 2018 email is the result of Mowers' schemes to obstruct and affect articles in commerce, in violation of 18 U.S.C. § 1951(a), by using fear in threatening criminal consequences, punishment from OSHA and the loss of Tomaszewicz's job should WP not obtain the property of Plaintiff - its business associated with pan sales and its right to solicit the sale of pans that compete with Defendants.

384.

iii.      Predicate Act Number Three

Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of extortion in violation of 18 U.S.C. § 1951(a) by, having devised schemes to obtain the money and property from another, Plaintiff, with its consent, induced by wrongful use of fear at some time on or about November 16, 2018, when Mowers sent Sollenberger the November 16, 2018 messages.

385.

Accordingly, the November 16, 2018 messages are the results of Mowers' schemes to obstruct and affect articles in commerce, in violation of 18 U.S.C. § 1951(a), by using fear in threatening criminal consequences should WP not obtain the property of Plaintiff - its business associated with pan sales and its right to solicit the sale of pans that compete with Defendants.

386.

iv.    Predicate Act Number Four

Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of extortion in violation of 18 U.S.C. § 1951(a) by, having devised schemes to obtain the money and property from another, Plaintiff, with its consent, induced by the wrongful use of threatened force, violence and fear at some time on or about November 17, 2018, Mowers sent Joice the following November 17, 2018 texts.

145

387.

Accordingly, the November 17, 2018 texts are the result of Mowers'
schemes to obstruct and affect articles in commerce, in violation of 18 U.S.C. §
1951(a), by wrongfully using threatened force and violence in going "nuclear" and
wrongfully using fear in threatening criminal consequences should WP not obtain
the property of Plaintiff - its business associated with pan sales and its right to
solicit the sale of pans that compete with Defendants.

388.

v.     Predicate Act Number Five

Mowers committed, attempted to commit, and/or aided and abetted the
commission of the crime of extortion in violation of 18 U.S.C. § 1951(a) by,
having devised schemes to obtain the money and property from another, Plaintiff,
with its consent, induced by the wrongful use of fear at some time on or about
December 4, 2018, Mowers sent the December 4, 2018 email to Harris.

389.

Accordingly, the December 4, 2018, 2018 email is the result of Mowers'
schemes to obstruct and affect articles in commerce, in violation of 18 U.S.C. §
1951(a), by using fear of catastrophic consequences should WP not obtain the
property of Plaintiff - its business associated with pan sales and its right to solicit
the sale of pans that compete with Defendants.

390.

vi.    <u>Predicate Act Number Six</u>

Mowers committed, attempted to commit, and/or aided and abetted the

commission of the crime of extortion in violation of 18 U.S.C. § 1951(a) by,

having devised schemes to obtain the money and property from another, Plaintiff,

with its consent, induced by the wrongful use of fear at some time on or about

December 9, 2018, Mowers sent the following December 9, 2018 email to Harris.

391.

Accordingly, the December 9, 2018 email is the result of Mowers' schemes

to obstruct and affect articles in commerce, in violation of 18 U.S.C. § 1951(a), by

using fear in threatening criminal consequences should WP not obtain the property

of Plaintiff - its business associated with pan sales and its right to solicit the sale of

pans that compete with Defendants.

392.

vii.    <u>Predicate Act Number Seven</u>

Mowers committed, attempted to commit, and/or aided and abetted the

commission of the crime of extortion in violation of 18 U.S.C. § 1951(a) by,

having devised schemes to obtain the money and property from another, Plaintiff,

with its consent, induced by wrongful use of fear at some time on or about

November 18, 2018, when Mowers sent Tomaszewicz the Tomaszewicz
November 18, 2018 texts.

393.

Accordingly, the Tomaszewicz November 18, 2018 texts are the results of
Mowers' schemes to obstruct and affect articles in commerce, in violation of 18
U.S.C. § 1951(a), by using fear in threatening criminal consequences should WP
not obtain the property of Plaintiff - its business associated with pan sales and its
right to solicit the sale of pans that compete with Defendants.

394.

viii.   Predicate Act Number Eight

Mowers committed, attempted to commit, and/or aided and abetted the
commission of the crime of extortion in violation of 18 U.S.C. § 1951(a) by,
having devised schemes to obtain the money and property from another, Plaintiff,
with its consent, induced by wrongful use of fear at some time on or about October
30, 2018, when Mowers sent Harris the October 30, 2018 email.

395.

Accordingly, the October 30, 2018 email are the results of Mowers' schemes
to obstruct and affect articles in commerce, in violation of 18 U.S.C. § 1951(a), by
using fear in threatening criminal consequences should WP not obtain the property

of Plaintiff - its business associated with pan sales and its right to solicit the sale of pans that compete with Defendants.

396.

ix.     Predicate Act Number Nine

Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of extortion in violation of 18 U.S.C. § 1951(a) by, having devised schemes to obtain the money and property from another, Plaintiff, with its consent, induced by wrongful use of fear at some time on or about November 18, 2018, when Mowers posted the first November 18, 2018 post.

397.

Accordingly, the first November 18, 2018 post are the results of Mowers' schemes to obstruct and affect articles in commerce, in violation of 18 U.S.C. § 1951(a), by using fear in threatening criminal consequences should WP not obtain the property of Plaintiff - its business associated with pan sales and its right to solicit the sale of pans that compete with Defendants.

398.

x.     Predicate Act Number Ten

Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of extortion in violation of 18 U.S.C. § 1951(a) by, having devised schemes to obtain the money and property from another, Plaintiff,

with its consent, induced by wrongful use of fear at some time on or about

November 26, 2018, when Mowers posted the second November 26, 2018 post.

399.

Accordingly, the November 26, 2018 post are the results of Mowers'

schemes to obstruct and affect articles in commerce, in violation of 18 U.S.C. §

1951(a), by using fear in threatening criminal consequences should WP not obtain

the property of Plaintiff - its business associated with pan sales and its right to

solicit the sale of pans that compete with Defendants.

400.

xi.    Predicate Act Number Eleven

Mowers committed, attempted to commit, and/or aided and abetted the

commission of the crime of extortion in violation of 18 U.S.C. § 1951(a) by,

having devised schemes to obtain the money and property from another, Plaintiff,

with its consent, induced by the wrongful use of fear at various points in time

between January and April of 2019 when Mowers personally appeared on no less

than three separate occasions at multiple construction sites of general contractor

Adolfson & Peterson Construction, who is a customer of Plaintiff, that purchased

and was using pans sold by Plaintiff on its jobsites.  While on the jobsites, Mowers

told employees of Adolfson & Peterson Construction that its use of the pans could

result in death and that Adolfson & Peterson Construction could face punishment

by OSHA (i.e., through citations and/or violations) by continuing its use of

Plaintiff's pans on the construction site.

<p style="text-align: center;">401.</p>

Accordingly, Mowers visits to Plaintiff's customer, Adolfson & Peterson

Construction, and the statements made to its employees are the results of Mowers'

schemes to obstruct and affect articles in commerce, in violation of 18 U.S.C. §

1951(a), by using fear in threatening catastrophic consequences and punishment by

OSHA (i.e., through citations and/or violations) should WP not obtain the property

of Plaintiff - its business associated with pan sales and its right to solicit the sale of

pans that compete with Defendants.

<p style="text-align: center;">402.</p>

xii.   Predicate Act Number Twelve

Plaintiff is informed and therefore believes that Mowers committed,

attempted to commit, and/or aided and abetted the commission of the crime of

extortion in violation of 18 U.S.C. § 1951(a) by, having devised schemes to obtain

the money and property from another, Plaintiff, with its consent, induced by the

wrongful use of fear at various points in time between January and May of 2019,

Mowers personally appeared on at least one construction site of commercial

concrete contractors The Conco Companies, who is a customer of Plaintiff, that

purchased and was using Plaintiff's pans on its construction site.  While on the

construction site of The Conco Companies, Plaintiff is informed and believes that Mowers made slanderous and defamatory false statements to employees of The Conco Companies with respect to Plaintiff and/or the Plaintiff's pans that were on the jobsite.

<div align="center">403.</div>

Accordingly, Mowers visit to Plaintiff's customer, The Conco Companies, and the statements made to its employees are the results of Mowers' schemes to obstruct and affect articles in commerce, in violation of 18 U.S.C. § 1951(a), by using fear should WP not obtain the property of Plaintiff - its business associated with pan sales and its right to solicit the sale of pans that compete with Defendants.

<div align="center">**THEFT BY EXTORTION**</div>

<div align="center">404.</div>

Pursuant to 18 U.S.C. § 1961(1)(A), a predicate act under RICO also includes any "act or threat . . . involving extortion . . . which is chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1)(A).

<div align="center">405.</div>

O.C.G.A. § 16-4-1 provides that "[a] person commits the offense of criminal attempt when, with intent to commit a specific crime, he performs any act which constitutes a substantial step toward the commission of that crime.

<div align="center">152</div>

406.

O.C.G.A. § 16-8-16 is Georgia's theft by extortion statute, which provides in

relevant part:

> **(a)** A person commits the offense of theft by extortion when he
> unlawfully obtains property of or from another person by threatening to:
>
> > **(1)** Inflict bodily injury on anyone or commit any other criminal
> > offense;
> > **(2)** Accuse anyone of a criminal offense;
> > **(3)** Disseminate any information tending to subject any person to
> > hatred, contempt, or ridicule or to impair his credit or business repute;
>
> […]
>
> **(d)** A person convicted of the offense of theft by extortion shall be
> punished by imprisonment for not less than one nor more than ten years.

407.

xiii.   <u>Predicate Act Number Thirteen</u>

On or about November 18, 2018 (a Sunday), Mowers sent Joice, a Georgia

resident, the Joice November 18, 2018 texts.

408.

Accordingly, when viewed in the context of Mowers October 18, 2018 email

to Joice stating "I'd suggest you recall all the sold [sic] since February using my

data and put together a strategy where we can stock all of your branches like we

agreed to and provide the best and safe product to your customers," and Mowers

November 17, 2018 text to Joice requesting that he "fly to San Diego by Monday"

to discuss the same, Mowers' November 18, 2019 text stating that the "Press release goes out Monday" was a threat to disseminate information tending to subject Plaintiff to hatred, contempt, ridicule and impair its business repute.

409.

Mowers' November 18, 2018 text to Joice stating that the "Press release goes out Monday" was a substantial step toward the commission of the crime of theft by extortion and was sent with the intent to commit the specific crime of theft by extortion as it constitutes Mowers attempt to obtain the property of Plaintiff - its business associated with pan sales and its right to solicit the sale of pans that compete with WP.

410.

Alternatively, the October 18, 2018 texts, the October 18, 2018 email, October 30, 2018 email, November 16, 2018 message, the first, second and third November 17, 2018 LinkedIn posts, November 17, 2018 texts, November 17, 2018 texts, November 18, 2018 LinkedIn posts, the second November 26, 2018 post and December 9, 2018 email (and attachment) similarly constitute theft by extortion as a result of threats to disseminate information tending to subject Plaintiff to hatred, contempt, ridicule and impair its business repute and additionally constitute accusations of criminal offenses and are therefore predicate acts of racketeering activity.

411.

Alternatively, Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of extortion in violation of 18 U.S.C. § 1951(a) by, having devised schemes or artifice to obtain the money and property from another, Plaintiff, with its consent, induced by wrongful use of fear as a result of mowers sending the October 18, 2018 email, the November 17, 2018 text messages, and the November 18, 2018 text messages.

## WIRE FRAUD

412.

Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of wire fraud in violation of 18 U.S.C. § 1343 by, having devised schemes to defraud, or for obtaining property by means of false or fraudulent pretenses, representations, promises, knowingly transmitted, or caused to be transmitted, by means of wire, radio or television communication in interstate commerce, writings, signals, pictures, or sounds for the purpose of executing the scheme or artifice to defraud.

413.

xiv.   Predicate Act Number Fourteen

More specifically, Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of wire fraud in violation of 18 U.S.C. §

1343 by, having devised schemes to defraud, or for obtaining property by means of false or fraudulent pretenses, representations, promises, knowingly transmitted, or caused to be transmitted, at some time on or about October 18, 2018, writings and signals, in the form of the October 18, 2018 LinkedIn post sent from California to Plaintiff's headquarters and its employees in Georgia for the purpose of executing the scheme or artifice to defraud, by means of wire, radio, or television communication in interstate commerce.  The statements included in the October 18, 2018 LinkedIn post are fraudulent for reasons, including but not limited to, the fact that Mowers state that Plaintiff's competing pans are "not certified" and "can result in injury or death."

<p style="text-align:center">414.</p>

xv.   <u>Predicate Act Number Fifteen</u>

More specifically, Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of wire fraud in violation of 18 U.S.C. § 1343 by, having devised schemes to defraud, or for obtaining property by means of false or fraudulent pretenses, representations, promises, knowingly transmitted, or caused to be transmitted, at some time on or about November 1, 2018, writings and signals, in the form of the November 1, 2018 comment sent from California to Plaintiff's headquarters and its employees in Georgia for the purpose of executing the scheme or artifice to defraud, by means of wire, radio, or television

communication in interstate commerce.  The statements included in the November

1, 2018 comment are fraudulent for reasons, including but not limited to, the fact

that Mowers states that HD Supply "paid" Good AdWords to use "our brand,

image and safety data but delivering another product."

<div align="center">415.</div>

xvi.   <u>Predicate Act Number Sixteen</u>

More specifically, Mowers committed, attempted to commit, and/or aided

and abetted the commission of the crime of wire fraud in violation of 18 U.S.C. §

1343 by, having devised schemes to defraud, or for obtaining property by means of

false or fraudulent pretenses, representations, promises, knowingly transmitted, or

caused to be transmitted, at some time on or about November 17, 2018, writings

and signals, in the form of the first November 17, 2018 LinkedIn post sent from

California to Plaintiff's headquarters and its employees in Georgia for the purpose

of executing the schemes to defraud, by means of wire, radio, or television

communication in interstate commerce.  The statements included in the first

November 17, 2018 post are fraudulent for reasons, including but not limited to,

the fact that Mowers states that Sollenberger and/or Plaintiff are guilty of

"Criminal. Felony Fraud."

<div align="center">416.</div>

xvii.   <u>Predicate Act Number Seventeen</u>

<div align="center">157</div>

More specifically, Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of wire fraud in violation of 18 U.S.C. § 1343 by, having devised schemes to defraud, or for obtaining property by means of false or fraudulent pretenses, representations, promises, knowingly transmitted, or caused to be transmitted, at some time on or about November 17, 2018, writings and signals, in the form of the second November 17, 2018 post sent from California to Plaintiff's headquarters and its employees in Georgia for the purpose of executing the schemes to defraud, by means of wire, radio, or television communication in interstate commerce.  The statements included in the second November 17, 2018 LinkedIn post are fraudulent for reasons, including but not limited to, the fact that Mowers states that Plaintiff's competing pans are "going to hurt or kill someone" and "this is a felony!"

417.

xviii.  Predicate Act Number Eighteen

More specifically, Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of wire fraud in violation of 18 U.S.C. § 1343 by, having devised schemes to defraud, or for obtaining property by means of false or fraudulent pretenses, representations, promises, knowingly transmitted, or caused to be transmitted, at some time on or about November 17, 2018, writings and signals, in the form of the third November 17, 2018 post sent from California

to Plaintiff's headquarters and its employees in Georgia for the purpose of executing the schemes to defraud, by means of wire, radio, or television communication in interstate commerce.  The statements included in the first November 18, 2018 post are fraudulent for reasons, including but not limited to, the fact that Mowers states that Plaintiff was served with a "cease and desist order."

418.

xix.   Predicate Act Number Nineteen

More specifically, Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of wire fraud in violation of 18 U.S.C. § 1343 by, having devised schemes to defraud, or for obtaining property by means of false or fraudulent pretenses, representations, promises, knowingly transmitted, or caused to be transmitted, at some time on or about November 18, 2018, writings and signals, in the form of the first November 18, 2018 post sent from California to Plaintiff's headquarters and its employees in Georgia for the purpose of executing the schemes to defraud, by means of wire, radio, or television communication in interstate commerce.  The statements included in the first November 18, 2018 post are fraudulent for reasons, including but not limited to, the fact that Mowers states that Plaintiff is a "criminal" that is guilty of "Willful infringement" selling "Counterfeit" products.

419.

xx.   Predicate Act Number Twenty

More specifically, Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of wire fraud in violation of 18 U.S.C. § 1343 by, having devised schemes to defraud, or for obtaining property by means of false or fraudulent pretenses, representations, promises, knowingly transmitted, or caused to be transmitted, at some time on or about November 18, 2018, writings and signals, in the form of the second November 18, 2018 post sent from California to Plaintiff's headquarters and its employees in Georgia for the purpose of executing the schemes to defraud, by means of wire, radio, or television communication in interstate commerce.

420.

xxi.   Predicate Act Number Twenty-One

More specifically, Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of wire fraud in violation of 18 U.S.C. § 1343 by, having devised schemes to defraud, or for obtaining property by means of false or fraudulent pretenses, representations, promises, knowingly transmitted, or caused to be transmitted, at some time on or about November 18, 2018, writings and signals, in the form of the third November 18, 2018 post sent from California to Plaintiff's headquarters and its employees in Georgia for the purpose of

executing the schemes to defraud, by means of wire, radio, or television communication in interstate commerce.  The statements included in the third November 18, 2018 post are fraudulent for reasons, including but not limited to, the fact that Mowers states that he "purchased three counterfeit pans" from Plaintiff.

<div align="center">421.</div>

xxii.   <u>Predicate Act Number Twenty Two</u>

More specifically, Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of wire fraud in violation of 18 U.S.C. § 1343 by, having devised schemes to defraud, or for obtaining property by means of false or fraudulent pretenses, representations, promises, knowingly transmitted, or caused to be transmitted, at some time on or about November 18, 2018, writings and signals, in the form of the fourth November 18, 2018 post sent from California to Plaintiff's headquarters and its employees in Georgia for the purpose of executing the schemes to defraud, by means of wire, radio, or television communication in interstate commerce.  The statements included in the fourth November 18, 2018 post are fraudulent for reasons, including but not limited to, the fact that Mowers states that he purchased "another counterfeit pan" from Plaintiff "that is fake and unsafe."

<div align="center">422.</div>

xxiii.  Predicate Act Number Twenty Three

More specifically, Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of wire fraud in violation of 18 U.S.C. § 1343 by, having devised schemes to defraud, or for obtaining property by means of false or fraudulent pretenses, representations, promises, knowingly transmitted, or caused to be transmitted, at some time on or about November 18, 2018, writings and signals, in the form of the fifth November 18, 2018 post sent from California to Plaintiff's headquarters and its employees in Georgia for the purpose of executing the schemes to defraud, by means of wire, radio, or television communication in interstate commerce.  The statements included in the fifth November 18, 2018 post are fraudulent for reasons, including but not limited to, the fact that Mowers states that Plaintiff is engaging in "illegal sales" and that "[e]veryone in the sales process is criminally liable" and violated the "Trademark Counterfeiting Act of 1984."

423.

xxiv.  Predicate Act Number Twenty Four

More specifically, Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of wire fraud in violation of 18 U.S.C. § 1343 by, having devised schemes to defraud, or for obtaining property by means of false or fraudulent pretenses, representations, promises, knowingly transmitted, or

caused to be transmitted, at some time on or about November 18, 2018, writings and signals, in the form of the sixth November 18, 2018 post sent from California to Plaintiff's headquarters and its employees in Georgia for the purpose of executing the schemes to defraud, by means of wire, radio, or television communication in interstate commerce.  The statements included in the sixth November 18, 2018 post are fraudulent for reasons, including but not limited to, the fact that Mowers states that Plaintiff is "counterfeiting" Defendants' pans and "using fake osha certificates."

424.

xxv.   Predicate Act Number Twenty Five

More specifically, Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of wire fraud in violation of 18 U.S.C. § 1343 by, having devised schemes to defraud, or for obtaining property by means of false or fraudulent pretenses, representations, promises, knowingly transmitted, or caused to be transmitted, at some time on or about November 25, 2018, writings and signals, in the form of the *November 25, 2018* comment sent from California to Plaintiff's headquarters and its employees in Georgia for the purpose of executing the schemes to defraud, by means of wire, radio, or television communication in interstate commerce.  The statements included in the November 25, 2018 LinkedIn post are fraudulent for reasons, including but not limited to, the

fact that Mowers states that Plaintiff's pans have "lifting hardware that could easily fail and kill or injury."

425.

xxvi.  Predicate Act Number Twenty Six

More specifically, Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of wire fraud in violation of 18 U.S.C. § 1343 by, having devised schemes to defraud, or for obtaining property by means of false or fraudulent pretenses, representations, promises, knowingly transmitted, or caused to be transmitted, at some time on or about November 26, 2018, writings and signals, in the form of the first November 26, 2018 post sent from California to Plaintiff's headquarters and its employees in Georgia for the purpose of executing the schemes to defraud, by means of wire, radio, or television communication in interstate commerce.  The statements included in the first November 26, 2018 post are fraudulent for reasons, including but not limited to, the fact that Mowers states that Plaintiff is selling "counterfeit pans" that are "[c]ertified."

426.

xxvii. Predicate Act Number Twenty Seven

More specifically, Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of wire fraud in violation of 18 U.S.C. § 1343 by, having devised schemes to defraud, or for obtaining property by means of

false or fraudulent pretenses, representations, promises, knowingly transmitted, or caused to be transmitted, at some time on or about September 4, 2019, and continuing as of the date of the filing of this First Amended Complaint, writings and signals, in the form of the information contained on the "safety" page of the Ecobasins e-commerce website sent from California and available to individuals in the United States, including Plaintiff's employees, Plaintiff's customers, and Plaintiff's prospective customers in Georgia for the purpose of executing the schemes to defraud, by means of wire, radio, or television communication in interstate commerce.  Given the litany of statements made by Mowers on LinkedIn and on Mowers e-commerce website regarding Plaintiff's pans being "counterfeit," the statements made on this "safety" page are fraudulent for reasons including, but not limited to, this page continuing such fraudulent misrepresentations regarding "known counterfeits" as the only "known counterfeits" identified by Mowers are those which Mowers alleges to be supplied by Plaintiff.

427.

xxviii.        Predicate Act Number Twenty Eight

More specifically, Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of wire fraud in violation of 18 U.S.C. § 1343 by, having devised schemes to defraud, or for obtaining property by means of false or fraudulent pretenses, representations, promises, knowingly transmitted, or

caused to be transmitted, at some time on or about November 26, 2018, writings and signals, in the form of the third November 26, 2018 post sent from California to Plaintiff's headquarters and its employees in Georgia for the purpose of executing the schemes to defraud, by means of wire, radio, or television communication in interstate commerce.  The statements included in the third November 26, 2018 post are fraudulent for reasons, including but not limited to, the fact that Mowers included a "URGENT CRANE/RIGGING SAFETY NOTICE FOR ALL JOB-SITES IN THE USA" as if it originated from a governmental authority, and fraudulently characterizes Plaintiff's products.

428.

xxix.        Predicate Act Number Twenty Nine

More specifically, Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of wire fraud in violation of 18 U.S.C. § 1343 by, having devised schemes to defraud, or for obtaining property by means of false or fraudulent pretenses, representations, promises, knowingly transmitted, or caused to be transmitted, at some time on or about November 26, 2018, writings and signals, in the form of the fourth November 26, 2018 post sent from California to Plaintiff's headquarters and its employees in Georgia for the purpose of executing the schemes to defraud, by means of wire, radio, or television communication in interstate commerce. The statements included in the fourth

November 26, 2018 post are fraudulent for reasons, including but not limited to, the fact that it fraudulently characterizes Plaintiff's products.

429.

xxx.   Predicate Act Number Thirty

More specifically, Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of wire fraud in violation of 18 U.S.C. § 1343 by, having devised schemes to defraud, or for obtaining property by means of false or fraudulent pretenses, representations, promises, knowingly transmitted, or caused to be transmitted, at some time on or about November 26, 2018, writings and signals, in the form of the fifth November 26, 2018 post sent from California to Plaintiff's headquarters and its employees in Georgia for the purpose of executing the schemes to defraud, by means of wire, radio, or television communication in interstate commerce. The statements included in the fifth November 26, 2018 post are fraudulent for reasons, including but not limited to, the fact that Plaintiff and Sollenberger are selling "counterfeits" with "fake certifications" that constitutes "federal infringement."

430.

xxxi.  Predicate Act Number Thirty One

More specifically, Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of wire fraud in violation of 18 U.S.C. §

1343 by, having devised schemes to defraud, or for obtaining property by means of false or fraudulent pretenses, representations, promises, knowingly transmitted, or caused to be transmitted, at some time on or about November 26, 2018, writings and signals, in the form of the sixth November 26, 2018 post sent from California to Plaintiff's headquarters and its employees in Georgia for the purpose of executing the schemes to defraud, by means of wire, radio, or television communication in interstate commerce.  The statements included in the sixth November 26, 2018 post are fraudulent for reasons, including but not limited to, the fact that it fraudulently characterizes Plaintiff's products.

431.

xxxii. Predicate Act Number Thirty Two

More specifically, Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of wire fraud in violation of 18 U.S.C. § 1343 by, having devised schemes to defraud, or for obtaining property by means of false or fraudulent pretenses, representations, promises, knowingly transmitted, or caused to be transmitted, at some time on or about November 26, 2018, writings and signals, in the form of the November 26, 2018 comment sent from California to Plaintiff's headquarters and its employees in Georgia for the purpose of executing the schemes to defraud, by means of wire, radio, or television communication in interstate commerce.  The statements included in the November

26, 2018 comment are fraudulent for reasons, including but not limited to, the fact
that Plaintiff is selling "counterfeit pans."

<div align="center">432.</div>

xxxiii.        <u>Predicate Act Number Thirty Three</u>

More specifically, Mowers committed, attempted to commit, and/or aided
and abetted the commission of the crime of wire fraud in violation of 18 U.S.C. §
1343 by, having devised schemes to defraud, or for obtaining property by means of
false or fraudulent pretenses, representations, promises, knowingly transmitted, or
caused to be transmitted, at some time on or about December 3, 2018, writings and
signals, in the form of the December 3, 2018 post sent from California to
Plaintiff's headquarters and its employees in Georgia for the purpose of executing
the schemes to defraud, by means of wire, radio, or television communication in
interstate commerce.  The statements included in the December 3, 2018 post are
fraudulent for reasons, including but not limited to, the fact that Plaintiff "cut and
paste" his "brand."

<div align="center">433.</div>

xxxiv.<u>Predicate Act Number Thirty Four</u>

More specifically, Mowers committed, attempted to commit, and/or aided
and abetted the commission of the crime of wire fraud in violation of 18 U.S.C. §
1343 by, having devised schemes to defraud, or for obtaining property by means of

<div align="center">169</div>

false or fraudulent pretenses, representations, promises, knowingly transmitted, or caused to be transmitted, at some time on or about December 9, 2018, writings and signals, in the form of the "CRANE & RIGGING JOB-SITE SAFETY ALERT" sent in an email from California to Plaintiff's headquarters and its employees in Georgia, and Plaintiff is informed and believes was sent to Plaintiff's customers across the nation, for the purpose of executing the schemes to defraud, by means of wire, radio, or television communication in interstate commerce. The statements included in the "CRANE & RIGGING JOB-SITE SAFETY ALERT" are fraudulent for reasons, including but not limited to, the fact that Mowers alleges Plaintiff is "knowingly selling counterfeit steel 'rated' Washout Pans."

434.

xxxv. Predicate Act Number Thirty Five

More specifically, Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of wire fraud in violation of 18 U.S.C. § 1343 by, having devised schemes to defraud, or for obtaining property by means of false or fraudulent pretenses, representations, promises, knowingly transmitted, or caused to be transmitted, at some time on or about December 11, 2018, writings and signals, in the form of the first December 11, 2018 post sent from California to Plaintiff's headquarters and its employees in Georgia for the purpose of executing the schemes to defraud, by means of wire, radio, or television communication in

interstate commerce.  The statements included in the first December 11, 2018 are fraudulent for reasons, including but not limited to, the fact that Mowers alleges Plaintiff is selling "counterfeit pans."

435.

xxxvi.Predicate Act Number Thirty Six

More specifically, Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of wire fraud in violation of 18 U.S.C. § 1343 by, having devised schemes to defraud, or for obtaining property by means of false or fraudulent pretenses, representations, promises, knowingly transmitted, or caused to be transmitted, at some time on or about December 11, 2018, writings and signals, in the form of the second December 11, 2018 post sent from California to Plaintiff's headquarters and its employees in Georgia for the purpose of executing the schemes to defraud, by means of wire, radio, or television communication in interstate commerce.  The statements included in the second December 11, 2018 are fraudulent for reasons, including but not limited to, the fact that Mowers fraudulently characterizing Plaintiff's products.

436.

xxxvii.    Predicate Act Number Thirty Seven

More specifically, Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of wire fraud in violation of 18 U.S.C. § 1343 by, having devised schemes to defraud, or for obtaining property by means of false or fraudulent pretenses, representations, promises, knowingly transmitted, or caused to be transmitted, at some time on or about April 23, 2019, writings and signals, in the form of the April 23, 2019 LinkedIn post sent from California to Mowers' LinkedIn followers nationwide for the purpose of executing the schemes to defraud, by means of wire, radio, or television communication in interstate commerce.  The statements included in the April 23, 2019 LinkedIn post are fraudulent for reasons, including but not limited to, the fact that Mowers alleges Plaintiff violated the "RICO Act."

437.

xxxviii.    Predicate Act Number Thirty Eight

More specifically, Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of wire fraud in violation of 18 U.S.C. § 1343 by, having devised schemes to defraud, or for obtaining property by means of false or fraudulent pretenses, representations, promises, knowingly transmitted, or caused to be transmitted, at some time on or about May 9, 2019, writings and signals, in the form of the first May 9, 2019 LinkedIn post sent from California to Mowers' LinkedIn followers nationwide for the purpose of executing the schemes

to defraud, by means of wire, radio, or television communication in interstate commerce.  The statements included in the second first May 9, 2019 post are fraudulent for reasons, including but not limited to, the fact that Mowers alleges Plaintiff violated the "RICO Act."

<div align="center">438.</div>

xxxix. <u>Predicate Act Number Thirty Nine</u>

More specifically, Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of wire fraud in violation of 18 U.S.C. § 1343 by, having devised schemes to defraud, or for obtaining property by means of false or fraudulent pretenses, representations, promises, knowingly transmitted, or caused to be transmitted, at some time on or about May 9, 2019, writings and signals, in the form of the second May 9, 2019 LinkedIn post sent from California to the State of Washington to Jenny Durkan and Lisa Herbold, in addition to Mowers' LinkedIn followers nationwide, and for the purpose of executing the schemes to defraud, by means of wire, radio, or television communication in interstate commerce.  The statements included in the second May 9, 2019 are fraudulent for reasons, including but not limited to, the fact that Mowers fraudulently mischaracterizes Plaintiff's products.

<div align="center">439.</div>

xl.   <u>Predicate Act Number Forty</u>

<div align="center">173</div>

More specifically, Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of wire fraud in violation of 18 U.S.C. § 1343 by, having devised schemes to defraud, or for obtaining property by means of false or fraudulent pretenses, representations, promises, knowingly transmitted, or caused to be transmitted, at some time on or about May 9, 2019, writings and signals, in the form of the third May 9, 2019 LinkedIn post sent from California to Mowers' LinkedIn followers nationwide for the purpose of executing the schemes to defraud, by means of wire, radio, or television communication in interstate commerce.  The statements included in the third May 9, 2019 are fraudulent for reasons, including but not limited to, the fact that Mowers fraudulently mischaracterizes Plaintiff's products.

440.

xli.    Predicate Act Number Forty One

More specifically, Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of wire fraud in violation of 18 U.S.C. § 1343 by, having devised schemes to defraud, or for obtaining property by means of false or fraudulent pretenses, representations, promises, knowingly transmitted, or caused to be transmitted, at some time on or about May 16, 2019, writings and signals, in the form of the May 16, 2019 LinkedIn post and "DANGER!!! FAKE RIGGING EQUPMENT NOTIFICATION SOLD BY HD SUPPLY WHITE CAP

11/18/2018" included therein sent from California to Mowers' LinkedIn followers nationwide, and for the purpose of executing the schemes to defraud, by means of wire, radio, or television communication in interstate commerce.  The statements included in the May 16, 2019 LinkedIn post are fraudulent for reasons, including but not limited to, the fact that Mowers fraudulently mischaracterizes Plaintiff's products.

441.

xlii.   Predicate Act Number Forty-Two

More specifically, Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of wire fraud in violation of 18 U.S.C. § 1343 by, having devised schemes to defraud, or for obtaining property by means of false or fraudulent pretenses, representations, promises, knowingly transmitted, or caused to be transmitted, at some time on or about May 9, 2019, writings and signals, in the form of the first May 20, 2019 LinkedIn post sent from California to Mowers' LinkedIn followers nationwide for the purpose of executing the schemes to defraud, by means of wire, radio, or television communication in interstate commerce.  The statements included in the first May 20, 2019 LinkedIn post are fraudulent for reasons, including but not limited to, the fact that Mowers fraudulently mischaracterizes Plaintiff's products.

442.

xliii.   <u>Predicate Act Number Forty-Three</u>

More specifically, Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of wire fraud in violation of 18 U.S.C. § 1343 by, having devised schemes to defraud, or for obtaining property by means of false or fraudulent pretenses, representations, promises, knowingly transmitted, or caused to be transmitted, at some time between on or about May 23, 2019 to the present, writings and signals, in the form of the banner at the top WP website and the page contained therein entitled "BUYER BEWARE of WASHOUTPAN™ Counterfeits," transmitted from California to any user nationwide for the purpose of executing the schemes to defraud, by means of wire, radio, or television communication in interstate commerce.  The statements included in the "BUYER BEWARE of WASHOUTPAN™ Counterfeits" are fraudulent for reasons, including but not limited to, the fact that Mowers fraudulently mischaracterizes Plaintiff's products.

<div align="center">443.</div>

Plaintiff is informed and believes that Mowers engaged in additional predicate acts of racketeering activity in 2018 and 2019, the specific details of which exist in the form of evidence under the Defendants' knowledge and control to which Plaintiff does not uniquely have access to that will be acquired through discovery.

<div align="center">176</div>

444.

xliv.  <u>Predicate Act Number Forty Four</u>

More specifically, Mowers committed, attempted to commit, and/or aided and abetted the commission of the crime of wire fraud in violation of 18 U.S.C. § 1343 by, having devised schemes to defraud, or for obtaining property and/or services by means of false or fraudulent pretenses, representations, promises, knowingly transmitted, or caused to be transmitted, on November 14, 2018, long after Plaintiff severed its relationship with Defendants and Plaintiff was selling pans supplied by a company other than WP, Defendants visited Plaintiff's Georgia-based website and purchased a 72" x 72" x 24" pan from Plaintiff through Plaintiff's website, Order Number 30775662, paying the Georgia company with an American Express credit card knowing that the pan purchased and would be delivered would not be a WP (his company's) pan in response to the order.

445.

The order for the 72" x 72" x 24" pan was processed by Plaintiff's Atlanta headquarters.

446.

Defendants purchased the 72" x 72" x 24" pan from Plaintiff through Plaintiff's website knowing from Defendants' prior business relationship with Plaintiff that Plaintiff's employees in Georgia control and maintain Plaintiff's

website, and that orders placed through Plaintiff's website are processed by
Plaintiff's employees in Georgia.

447.

Plaintiff is informed and therefore believes that the 72" x 72" x 24" pan that
was received by the Defendants pursuant to Order Number 30775662 was
completed being manufactured in the State of Georgia.

448.

The 72" x 72" x 24" pan that was received by the Defendants pursuant to
Order Number 30775662 was originally shipped from the State of Georgia, by a
Limited Liability Company organized under the State of Georgia.

449.

Defendants ordered the 72" x 72" x 24" pan to allow Defendants the
opportunity to inspect and photograph the pan, which allowed Defendants to
further perpetuate their malicious fabrication and dissemination of false
information and defamatory commercial statements against Plaintiff with the intent
to injure Plaintiff.

450.

After receiving and photographing the 72" x 72" x 24" pan pursuant to
Order Number 30775662, Mowers proceeded to contact the credit card company to
fraudulently dispute the charges for the pan by telling the credit card company that

the pan Plaintiff sold to Mowers was counterfeit.  These statements were fraudulent as the 72" x 72" x 24" pan sold to Defendants by Plaintiff was not counterfeit. Defendants also proceeded to "file a report with them [American Express] that will allow a review and suspension of merchant processing for HD SUPPLY Construction & Industrial – White Cap HD Supply.  They [American Express] take selling of fake goods/misrepresentation very serious!"  Plaintiff incurred monetary damages as a result of Mowers' dispute of the credit card charges for the pan purchased from Plaintiff that he knew was not a WP pan before he ordered the pan, including but not limited, the freight costs associated with the initial delivery of the pan to Defendants, and the freight costs associated with the pick-up of the pan from Defendants after Defendants disputed the credit card charges for the pan.

451.

On November 14, 2018, long after Plaintiff severed its relationship with Defendants and Plaintiff was selling pans supplied by a company other than WP, Defendants visited Plaintiff's Georgia-based website and purchased a 72" x 72" x 14" pan, Order Number 30770235, and paid the Georgia company with an American Express credit card knowing that the pan purchased and would be delivered would not be a WP (his company's) pan in response to the order.

452.

The order for this pan was processed by Plaintiff's Atlanta office.

453.

Defendants purchased the 72" x 72" x 14" pan from Plaintiff through Plaintiff's website knowing from Defendants' prior business relationship with Plaintiff that Plaintiff's employees in Georgia control and maintain Plaintiff's website, and that orders placed through Plaintiff's website are processed by Plaintiff's employees in Georgia.

454.

Plaintiff is informed and therefore believes that the 72" x 72" x 14" pan that was received by the Defendants pursuant to Order Number 30770235 was completed being manufactured in the State of Georgia.

455.

The 72" x 72" x 14" pan that was received by the Defendants pursuant to Order Number 30770235 was originally shipped from the State of Georgia, by a Limited Liability Company organized under the State of Georgia.

456.

Defendants ordered the 72" x 72" x 14" pan to allow Defendants the opportunity to inspect and photograph the pan, which allowed Defendants to further perpetuate their malicious fabrication and dissemination of false

information and defamatory commercial statements against Plaintiff with the intent to injure Plaintiff.

457.

After receiving and photographing the 72" x 72" x 14" pan pursuant to Order Number 30770235, Mowers proceeded to contact the credit card company to fraudulently dispute the charges for the pan by telling the credit card company that the pan Plaintiff sold to Mowers was counterfeit. These statements were fraudulent as the 72" x 72" x 14" pan sold to Defendants by Plaintiff was not counterfeit. Defendants also proceeded to "file a report with them [American Express] that will allow a review and suspension of merchant processing for HD SUPPLY Construction & Industrial – White Cap HD Supply.  They [American Express] take selling of fake goods/misrepresentation very serious!"  Plaintiff incurred monetary damages as a result of Mowers' dispute of the credit card charges for the pan purchased from Plaintiff that he knew was not a WP pan before he ordered the pan, including but not limited, the freight costs associated with the initial delivery of the pan to Defendants, and the freight costs associated with the pick-up of the pan from Defendants after Defendants disputed the credit card charges for the pan.

458.

Mowers effectuated the purchases of the Georgia pans by deliberately visiting Plaintiff's website and placing the orders, thereby entering a commercial transaction with a business operating in Georgia.

459.

The aforementioned writings and/or signals, were sent from California to Mowers' credit card company and Plaintiff's headquarters and its employees in Georgia for the purpose of executing the scheme or artifice to defraud, by means of wire, radio, or television communication in interstate commerce.

460.

Evidence of Mowers fraud exists in the form of his second November 18, 2018 post:



461.

Further evidence of Mowers fraud exists in the form of his third November 18, 2018 post:



462.

As a result of Mowers' racketeering activity, Plaintiff has sustained direct injuries to its business, and such injuries were by reason of, and proximately caused by, the substantive RICO violations.

## COUNT IX – GEORGIA RICO

## (AGAINST MOWERS ONLY)

463.

Plaintiff incorporates by reference and re-alleges each and every preceding paragraph of this complaint as if restated completely herein.

464.

At all relevant times, Mowers is a person within the meaning of Georgia RICO.

465.

At all relevant times, WP is an enterprise within the meaning of Georgia RICO.

466.

Mowers engaged in a pattern of racketeering activity through more than two predicate acts in furtherance of schemes with similar intents, results, victims, and methods of commission, with the last act within four years of another such act pursuant to OCGA § 16-14-3(8).

467.

Mowers committed predicate acts of racketeering activity under OCGA § 16-14-3(9)(A) by committing acts indictable under the following criminal statutes and RICO subsections:

- 18 U.S.C. § 1951(a), Extortion

- OCGA § 16-8-16, Theft by Extortion

- 18 U.S.C. § 1961, Wire Fraud

- O.C.G.A. § 16-10-23, Impersonating a Public Officer or Employee

468.

## EXTORTION

i. - xii.        <u>Predicate Acts Numbers One through Twelve</u>

As OCGA § 16-14-3(9)(A)(xxix) makes any conduct defined as "racketeering activity" under 18 U.S.C. Section 1961 (1)(A), (B), (C), and (D) a predicate act of racketeering activity under Georgia RICO, the facts set forth in paragraph 235 through 251 are re-alleged as if restated completely herein to constitute the  predicate acts to support Plaintiff's Georgia RICO cause of action.

469.

## THEFT BY EXTORTION

xiii.   <u>Predicate Act Number Thirteen</u>

As OCGA § 16-14-3(9)(A)(ix) defines a predicate act of racketeering activity as the attempt to commit crimes related to theft, the facts set forth in paragraph 252 through 258 are re-alleged as if restated completely herein to constitute a predicate act to support Plaintiff's Georgia RICO cause of action.

470.

## WIRE FRAUD

xiv. - xliv.   <u>Predicate Acts Numbers Fourteen through Forty Four</u>

As OCGA § 16-14-3(9)(A)(xxix) makes any conduct defined as "racketeering activity" under 18 U.S.C. Section 1961 (1)(A), (B), (C), and (D) a predicate act of racketeering activity under Georgia RICO, the facts set forth in paragraph 259 through 276 are re-alleged as if restated completely herein to constitute the  predicate acts of wire fraud to support Plaintiff's Georgia RICO cause of action.

471.

## IMPERSONATING A PUBLIC OFFICER OR EMPLOYEE

O.C.G.A. § 16-14-3(9)(A)(xv) defines a predicate act of racketeering activity as the impersonation of a public official or employee per O.C.G.A. 16-10-23.

472.

O.C.G.A. 16-10-23 provides:

A person who falsely holds himself out as a peace officer or other public officer or employee with intent to mislead another into believing that he is actually such officer commits the offense of impersonating an officer and, upon conviction thereof, shall be punished by a fine of not more than $1,000.00 or by imprisonment for not less than one nor more than five years, or both.

xlv.   Predicate Act Number Forty Five

473.

Between January and April of 2019, Mowers personally appeared on no less than three separate occasions at multiple construction sites of general contractor

186

Adolfson & Peterson Construction, who is a customer of Plaintiff, that purchased and was using Plaintiff's pans on its jobsites.  On Mowers first construction site appearance, he was fraudulently impersonating an OSHA inspector, which is a public officer and/or employee, and representing himself to employees of Adolfson & Peterson Construction as an employee of OSHA.  During this first appearance while Mowers was fraudulently impersonating an OSHA inspector, he made slanderous and defamatory false statements to employees of Adolfson & Peterson Construction with respect to Plaintiff and/or Plaintiff's pans that were on the jobsite, including but not limited to, that Plaintiff's pans were not OSHA certified and that Adolfson & Peterson Construction could be punished by OSHA for continuing its use of Plaintiff's pans on the construction site.

474.

This criminal violation constitutes predicate acts of Georgia RICO racketeering activities.

475.

Plaintiff is informed and believes that Mowers engaged in additional predicate acts of racketeering activity in 2018 and 2019, the specific details of which exist in the form of evidence under the Defendants' knowledge and control to which Plaintiff does not uniquely have access to that will be acquired through discovery.

## COUNTS VI – PUNITIVE DAMAGES

## (AGAINST BOTH WP AND MOWERS)

### 476.

Plaintiff incorporates by reference and re-alleges each and every preceding paragraph of this complaint as if restated completely herein.

### 477.

The actions and conduct of Defendants as alleged hereinabove were willful, wanton, and evinced an entire want of care which would raise the presumption of a conscious indifference to the consequences.

### 478.

By reason of the foregoing, Plaintiff is entitled to recover punitive damages in such an amount as may be shown by the evidence and determined in the enlightened conscience of the jury in order to punish Defendants for their misconduct and to deter said Defendants from engaging in similar misconduct in the future.

## COUNTS VI – ATTORNEYS' FEES

## (AGAINST BOTH WP AND MOWERS)

### 479.

Plaintiff incorporates by reference and re-alleges each and every preceding paragraph of this complaint as if restated completely herein.

480.

Defendants conduct as alleged hereinabove amounts to bad faith, as that term is used in O.C.G.A. § 13-6-11.

481.

Pursuant to O.C.G.A. § 13-6-11, Defendants' bad faith entitles Plaintiff to reasonable attorneys' fees and expenses of litigation in the pursuit of this litigation to enforce Plaintiffs' rights.

482.

Given Defendants' conduct, Plaintiff is also entitled to recover attorneys' fees and costs pursuant to O.C.G.A. § 16-14-6 (c).

483.

Given Defendants' conduct, Plaintiff is also entitled to recover attorneys' fees and costs pursuant to O.C.G.A. § 10-1-373(a).

484.

Given Defendants' conduct, Plaintiff is also entitled to recover attorneys' fees and costs pursuant to 18 U.S.C. § 1964 (c).

485.

Given Defendants' conduct, Plaintiff is also entitled to recover attorneys' fees and costs pursuant to 15 U.S.C. § 1117

WHEREFORE, Plaintiff respectfully requests this Court enter judgment in its favor and against Defendants as follows:

i.    For a permanent injunction against Defendants, including WP's officers, agents, employees, affiliates, assignees, parents, and all persons acting in concert or participation with it, who receive actual notice of the injunction by personal service or otherwise, enjoining and restraining each of them from, directly or indirectly: (1) engaging in unfair and deceptive trade practices; (2) tortiously interfering with Plaintiff's current and prospective business relationships; (3) falsely advertising, marketing, and/or selling Defendants' products; (4) using any false representations, which misrepresent the nature, characteristics, approval, or qualities of Plaintiff's products; or (5) engaging in any other false advertising or other unfair commercial activity with regard to any of Plaintiff's products;

ii.   For all general, special, compensatory, punitive, consequential and all other permissible damages and expenses associated with the Plaintiff's injuries and damages in an amount to be determined at trial, but not less than $75,000, incurred as a result of Defendants' actions;

    iii.    For treble damages in favor of Plaintiff pursuant to 15 U.S.C. § 1117, 18 U.S.C. § 1964 (c) and O.C.G.A. § 16-14-6 (c) as a result of Defendants' willful and intentional violations.

    iv.    For judgment in favor of Plaintiff awarding it its attorneys' fees and costs incurred in this action, pursuant to 15 U.S.C. § 1117, 18 U.S.C. § 1964 (c), O.C.G.A. § 10-1-373, O.C.G.A. § 16-14-6 (c) and O.C.G.A. § 13-6-11, and otherwise as appropriate;

    v.    That a jury be impaneled to resolve all factual disputes;

    vi.    For all future losses and recovery as deemed proper by the Court;

    vii.    For an award of pre- and post-judgment interest; and

    viii.    For any further legal and equitable relief this Court deems just and proper.

Submitted this 9th day of September, 2019.

                        **GORDON REES SCULLY MANSUKHANI LLP**

                        */s/ Chad A. Shultz*
                        Chad A. Shultz
                        Georgia Bar No. 644440
                        Vernon Phillip Hill IV
                        Georgia Bar No. 637841

                        *Attorneys for Plaintiff HD Supply Construction Supply, LTD.*

55 Ivan Allen Blvd. NW, Suite 750
Atlanta, Georgia 30308

Telephone: (404) 869-9054
cshultz@grsm.com
phill@grsm.com

## <u>CERTIFICATE OF COMPLIANCE WITH LR 7.1(D)</u>

Pursuant to LR 7.1(D), counsel for Plaintiff certifies that the **FIRST AMENDED COMPLAINT** has been prepared with Times New Roman font (14 point) approved by the Court in LR 5.1(B).

This 9th day of September 2019.


*/s/ Chad A. Shultz*
COUNSEL

1172402/47277130v.1