IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

WHITE CAP, L.P. (f/k/a HD SUPPLY
CONSTRUCTION SUPPLY, LTD.),

     Plaintiff,

          v.

REEF R. MOWERS and
WASHOUTPAN.COM, LLC,

     Defendants.

Civil Action No.
1:19-cv-02750-SDG

## OPINION AND ORDER

On August 11, 2021, the Court entered an order granting Plaintiff White Cap, L.P.'s motion for default judgment and issued a permanent injunction restraining Defendants from engaging in certain conduct.[1] The Court, however, delayed entry of final judgment because certain of White Cap's requests for damages required an evidentiary hearing.[2] That hearing was held on October 6, 2021, but Defendants did not appear.[3] Notice had been mailed to their address of record, but was returned as undeliverable.[4] During the hearing, counsel for White Cap presented evidence of the alleged damages caused by Defendants, with

---

[1]   ECF 109.

[2]   *Id.* at 29–30.

[3]   ECF 121.

[4]   *Id.*

certain of that evidence placed under seal because of its sensitive business and commercial nature.[5] Having reviewed the evidence and heard the arguments presented by White Cap, the Court finds as follows.

## I.    White Cap's Damages

The long factual and procedural history of this litigation is detailed in the Court's Order denying Defendants' motion to dismiss and granting White Cap's motion for default judgment, and will not be repeated here.[6] Many of the damages White Cap seeks are recoverable on more than one cause of action. As a result, the Court addresses damages by type rather than the claim to which they relate.

### A.    Actual Damages (Lost Profits, Refunds, Reputational Harm)

White Cap seeks its actual damages in connection with its Lanham Act false advertising, defamation, and federal and Georgia RICO causes of action.[7] It seeks only lost profits and customer returns for its tortious interference with business relations claim.[8] Under the Lanham Act, White Cap can recover "(1) [Defendants'] profits, (2) any damages [it] sustained . . . , and (3) the costs of the action." 15 U.S.C.

---

[5]    *Id.*; ECF 122, 123, 124.

[6]    *See generally* ECF 76, 109.

[7]    ECF 90-1, at 30–34. *See also* ECF 19 (First Am. Compl.), Counts I, II, III, IV, V, VIII, IX.

[8]    ECF 90-1, at 30–31, 34. *See also* ECF 19 (First Am. Compl.), Count VI.

§ 1117(a). For *per quod* defamatory statements, White Cap can recover for special harm (such as reputational damage or lost profits) on proof of such damages. *Johnson v. Citimortgage, Inc.*, 351 F. Supp. 2d 1368, 1377 (N.D. Ga. 2004); *McGee v. Gast*, 257 Ga. App. 882, 885 (2002). Under the RICO statutes, White Cap may treble its actual damages under 18 U.S.C. § 1964(c) or O.C.G.A. § 16-14-6(c).

Some of Defendants' more egregious behavior relates to Defendants' general campaign to destroy White Cap's business: Mowers falsely posing as an OSHA inspector at the job sites of two of White Cap's clients;[9] Defendants' internet postings of false and disparaging information about White Cap and its products;[10] accusing White Cap of criminal activity, as well as OSHA and RICO violations;[11] and harassing White Cap employees via text, email, and LinkedIn messages.[12] All of this supports White Cap's claims for actual damages.

### 1.   White Cap's Evidence[13]

White Cap presented the following testimony and evidence of its damages.

---

[9]   *Id.* ¶¶ 173–79, 316–24.

[10]   ECF 19, ¶¶ 82–214.

[11]   *Id.*

[12]   *Id.* ¶¶ 92–94, 110, 112.

[13]   Although certain of the evidence presented to the Court has been sealed, the Court does not find it appropriate to seal the amount of the damages award.

### i.   Tomaszawicz Testimony

White Cap's first witness was one of its employees, Jennifer Tomaszawicz, who also provided an affidavit in support of its motion for default judgment.[14] Tomaszawicz testified (among other things) about White Cap's lost profits and the refunds it was compelled to provide to two customers because of Defendants' conduct.[15] One client sought a refund because Mowers appeared at its worksite, pretending to be an OSHA inspector, threatened the client and made various false statements.[16] The refund cost White Cap $3,701.18.[17] The second client sought a refund because Mowers made false and defamatory statements about White Cap to the client.[18] This refund cost White Cap $16,582.[19] According to Tomaszawicz, whom the Court found to be credible, White Cap's sales decreased and its customers lost trust in the company as a result of Defendants' conduct.[20]

---

[14]   ECF 90-3.

[15]   *See generally* ECF 90-3 (Tomaszawicz Aff.); Oct. 6, 2021 H'g.

[16]   ECF 90-3, ¶ 13; Oct. 6, 2021 H'g; ECF 122 (Def.'s Exs. 3–4).

[17]   ECF 90-3, ¶ 13.

[18]   *Id.* ¶ 14.

[19]   *Id.*

[20]   Oct. 6, 2021 H'g.

### *ii.*    **Nelson Testimony**

Gregory Nelson was White Cap's second witness and also provided an affidavit in support of White Cap's motion for default judgment.[21] Nelson has a Bachelor of Science in Actuarial Science and currently serves as White Cap's finance manager.[22] His entire professional career has consisted of dealing with corporate finance and data analysis.[23] During the hearing, Nelson was qualified by the Court as an expert in those subject areas as it relates to White Cap's lost profits resulting from Defendants' conduct.[24]

In his affidavit, Nelson calculated White Cap's lost profits at $533,552.60.[25] At the hearing, White Cap presented evidence of and Nelson testified to his revised calculation of $398,842.[26] To reach this figure, Nelson averaged White Cap's gross margin for the two years prior to the end of the parties' contractual relationship (*i.e.*, 8 quarters).[27] He originally compared that number to the gross

---

[21]   ECF 90-6.

[22]   *Id.* ¶¶ 4, 6–8; Oct. 6, 2021 H'g. *See also* ECF 122-5, 122-6.

[23]   ECF 90-6, ¶ 9.

[24]   Oct. 6, 2021 H'g.

[25]   ECF 90-6, ¶ 18.

[26]   Oct. 6, 2021 H'g; ECF 123-1 (SEALED) (Def.'s Ex. 9), at 6.

[27]   Oct. 6, 2021 H'g; ECF 123-1 (SEALED) (Def.'s Exs. 8–9).

margin for the 10 quarters after the beginning of Defendants' misconduct.[28] (Nelson later used 11 quarters as more information became available.[29]) He discounted for the two-year "ramp-up" period after White Cap switched from using washout pans supplied by Defendants to a new supplier.[30] He then generated the amount of lost profits based on the differential between the two time periods.[31] This "delta" formed the basis for his determination of the amount of lost profits damages White Cap suffered as a result of Defendants' conduct.[32]

Nelson also testified about why there was a difference in the lost profits calculation in his affidavit and the amount to which he testified at the hearing. To confirm his original analysis, he re-reviewed every relevant transaction during the two separate time periods.[33] He pulled out non-routine transactions and those transactions related to products supplied by Defendants.[34] In so doing, Nelson

---

[28]   Oct. 6, 2021 H'g; ECF 123-1 (SEALED) (Def.'s Exs. 8–9).

[29]   Oct. 6, 2021 H'g.

[30]   *Id.*

[31]   *Id.*

[32]   *Id.*

[33]   *Id.*

[34]   *Id.*

analyzed every purchase made from White Cap during these timeframes.[35] This process led to the adjusted, lower figure.[36] The Court found Nelson to be credible.

### iii.   Georgantas Testimony

White Cap's final witness during the evidentiary hearing was Peter Georgantas.[37] As with White Cap's other two witnesses, Georgantas also provided an affidavit in support of the motion for default judgment.[38] He is White Cap's senior director of marketing and has been an employee there for 17 years.[39] Georgantas testified about the harm to White Cap's reputation because of Defendants' conduct, as well as the steps needed to repair and the costs of repairing that reputation. Specifically, Georgantas testified about the costs of a marketing campaign White Cap proposes to undertake.[40] That campaign is designed to increase White Cap's sales back to the place they were prior to Defendants' actions.[41] Georgantas indicated that the campaign would be

---

[35]  *Id.*

[36]  *Id.*

[37]  *Id.*

[38]  ECF 90-7.

[39]  Oct. 6, 2021 H'g. *See also* ECF 122-7.

[40]  Oct. 6, 2021 H'g.

[41]  *Id.*

implemented over approximately 2.5 years and cost $110,973.[42] He described the reasons for and type of marketing in which White Cap would engage, adjusting for direct costs among other things.[43] Georgantas also explained the corrective marketing plan he developed.[44] The Court found Georgantas to be credible.

### 2. Award

The Court awards $530,098.18 in actual damages. This is comprised of $398,842 in lost profits; $20,283.18 for refunds; and $110,973 for reputational harm.[45] White Cap also seeks to treble these damages under the Lanham Act or the RICO statutes.[46] While treble damages might otherwise be available on these facts, the Court concludes that an award of punitive damages is more appropriate given the nature of Defendants' conduct. White Cap concedes that trebling actual damages would be inappropriate if the Court awards punitive damages.[47]

The basis for the Court's actual damages award is explained below.

---

[42] ECF 123-3 (SEALED), at 8; Oct. 6, 2021 H'g.

[43] Oct. 6, 2021 H'g.

[44] ECF 123-3 (SEALED), at 8; ECF 124 (SEALED); Oct. 6, 2021 H'g.

[45] There is a one-dollar difference in the amount shown in Georgantas's affidavit and the figures in his exhibit. *Compare* ECF 90-7, ¶ 15 *with id.* at 8. The Court will rely on the chart ($110,973) rather than the text of Georgantas's affidavit.

[46] ECF 90-1, at 13–14.

[47] The Court's award of punitive damages is discussed *infra*, Section I.C.

### *i.*   **Lost Profits**

If there were ever an instance where a plaintiff has established it is entitled to lost profits damages, this is it. In its Order granting the default judgment, the Court expressed concern that (1) White Cap had not shown Nelson's qualifications to testify about lost profits and (2) the affidavit did not exclude other factors that might have contributed to the drop in White Cap's profits. White Cap has now satisfied those concerns with the evidence presented during the hearing.

Tomaszawicz testified about Defendants' specific misconduct and how it negatively affected White Cap's sales.[48] She also testified that factors like the COVID-19 pandemic did not negatively affect sales.[49] Based on the evidence, the Court concludes that White Cap's decline in sales is directly attributable to Defendants' illicit behavior. During the hearing, the Court qualified Nelson as an expert.[50] His method of calculating lost profits appropriately discounted for factors (such as ramp-up time) that might also have affected sales.[51] "The loss of income, of profits, and even of gratuitous entertainment and hospitality will be special

---

[48]   Oct. 6, 2021 H'g.

[49]   *Id.*

[50]   *Id.*

[51]   *Id.*

damage if the plaintiff can show that it was caused by the defendant's words."
*McGee v. Gast*, 257 Ga. App. 882, 885 (2002) (quoting *Webster v. Wilkins,* 217 Ga.
App. 194, 196 (1995)) (cleaned up) (emphasis omitted). *See also Crosby v. Spencer*,
207 Ga. App. 487, 488 (1993) (noting that lost profits are recoverable as damages if
shown with reasonable certainty); 15 U.S.C. § 1117(a) (under the Lanham Act, a
plaintiff may recover "any damages it sustained").

### ii.    Refunds

The Court has already ruled that White Cap is entitled to $20,283.18 in
amounts it was required to return to customers because of Defendants' conduct.[52]
The evidence presented during the hearing further supports that award.

### iii.    Reputational Harm

As with lost profits, White Cap is entitled to recover for reputational
damages under its *per quod* defamation claim. *Johnson*, 351 F. Supp. 2d at 1377. It is
also entitled to recover such damages under the Lanham Act. 15 U.S.C. § 1117(a).
Under O.C.G.A. § 51-12-2(a), general damages may be recovered without proof of
any special damages. Further, damages for slander *per se* do not require proof of
special damages. *See generally* O.C.G.A. § 51-5-4. An award of general damages is

---

[52]    ECF 109, at 21.

in the Court's discretion. *Zedan v. Bailey*, Case No. 7:19-cv-45 (WLS), 2021 WL 631393, at *6–*7 (M.D. Ga Feb. 18, 2021).

The evidence supporting reputational damages is the same as that supporting lost profits damages and demonstrates the extensive harm caused by Defendants. To help remedy the reputational harm, White Cap proposes a marketing plan designed to target that damage. Georgantas testified that the plan focuses on recovering the lost sales resulting from Defendants' misconduct.[53] Those costs—$110,973—are properly awarded as general damages, among other grounds.

### B.   Attorneys' Fees and Costs of Litigation

The Court has already held that White Cap may recover its costs of litigation incurred through the time of briefing the motion for default judgment ($3,433.66). The Court also held that White Cap was entitled to reasonable attorneys' fees under O.C.G.A. § 13-6-11 based on Defendants' bad-faith conduct.[54] Defendants have, apparently, carried on despite the permanent injunction.[55]

---

[53]   Oct. 6, 2021 H'g. *See also generally* ECF 90-7 (Georgantas Aff.).

[54]   ECF 90-1, at 30–31; ECF 109, at 23–24.

[55]   *See generally* ECF 127.

Concerning the reasonableness of the work performed and hours incurred by White Cap's attorneys, the Court applies the traditional lodestar test— reasonable hours expended times reasonable hourly rates. *Circle Y Constr. v. WRH Realty Servs., Inc.*, 721 F. Supp. 2d 1272, 1282–85 (N.D. Ga. 2010) (applying lodestar to determine reasonable attorneys' fees award under O.C.G.A. § 13-6-11).

For time and expenses incurred from July 2019 through September 2021, White Cap seeks $320,943.74 (including the $3,433.66 in costs already awarded).[56] This has been reduced by $69,268 in fees and $3,191.04 in costs, for amounts incurred in unrelated litigation between Defendants and White Cap.[57] Moreover, White Cap does not seek to recover for work performed by its attorneys in October 2021, including preparation for and participation in the evidentiary hearing.[58]

In support of its fee request, White Cap presents declarations by Sean Flaherty and V. Phillip Hill IV, two of its attorneys.[59] The Court has reviewed the detailed billing statements from White Cap's counsel and the supporting declarations, and concludes that the fees incurred and hours expended are

---

[56]   ECF 120-1, ¶ 8; ECF 128, ¶ 7.

[57]   ECF 120-1, ¶¶ 7–8.

[58]   *See generally* ECF 128.

[59]   ECF 90-2; ECF 120-1; ECF 128.

reasonable. The pleadings were extensive and detailed, and briefing on the personal-jurisdiction motion to dismiss was unnecessarily complicated because of Defendants' tit-for-tat exchanges and false statements to the Court, leading to White Cap's motions to hold in abeyance and for sanctions.[60] This is reflected in counsel's billing records.[61]

Based on those records, the vast majority of the work was performed by Flaherty and Hill, with the more "junior" attorney (Hill) doing the bulk of the substantive work. The billing rates for these attorneys ranged from $375 to $500 for the former and $285 to $400 for the latter.[62] Certain rate discounts provided to White Cap appear to account for these fluctuations.[63] Flaherty was a partner throughout the litigation. Hill was initially billed as an associate, and later as senior counsel. The rates for all other attorneys on the matter fall within this range.[64] Based on the evidence concerning the qualifications of each timekeeper,

---

[60] ECF 60; ECF 76, at 6–11, 44–49.

[61] ECF 120-2, at 2–22, 49–60, 83–87, 90–101, 104–112, 115–16.

[62] ECF 120-2, at 22, 24, 29, 60, 68, 71, 80, 87, 101, 112, 116, 121, 127, 130, 134, 137, 140, 145, 155, 158, 162, 167–68, 172; ECF 128-1, at 5.

[63] *Id.*

[64] The other attorneys who worked on the matter are associate David Bock; associate Hannah Brown; partner Eric Deitz; associate James Fielding; senior counsel Allison Jones; partner Brandon Saxon; and partner Chad Shultz.

the Court finds these rates reasonable for the Atlanta area for this type of action.[65]

Flaherty billed 238.50 total hours and Hill 572.20—as the Court would expect for

the quantity of work necessitated by this case. At the varying rates billed, Flaherty

incurred $104,925 in fees and Hill $209,161.50. The Court finds both the hours

incurred and the hourly rates to be reasonable and appropriate. White Cap is

accordingly entitled to a fee award of $320,943.74.

## C.   Punitive Damages

Finally, White Cap seeks punitive damages under O.C.G.A. § 51-12-5.1.[66]

Punitive damages are available to punish a defendant where there are

"aggravating circumstances" if the plaintiff proves "by clear and convincing

evidence that the defendant's actions showed willful misconduct." *Id.* § 51-12-

5.1(a), (b). The Court has already found that Defendants engaged in an all-out

campaign to smear White Cap and its products by repeatedly making knowingly

false statements and falsely representing themselves.[67] The Court also found that

Defendants acted intentionally, with malice and "conscious indifference to

consequences," and that "aggravating circumstances" exist. *Id.* An award of

---

[65]   ECF 90-2, at 33–53. *See also* ECF 90-2, at 78–81 (reflecting average hourly billing rates for intellectual property practitioners).

[66]   ECF 90-1, at 30–35.

[67]   ECF 109, at 24.

punitive damages is therefore appropriate. Further, Georgia's punitive damages cap does not apply because Defendants acted with the specific intent to cause harm.[68] *Id.* § 51-12-5.1(f).

Here, since White Cap would otherwise be entitled to treble its actual damages under its Lanham Act or RICO claims, the Court finds that a punitive damages award of three times White Cap's actual damages is appropriate to punish and deter Defendants from further misconduct. White Cap is therefore awarded $1,590,294.54 in punitive damages.

## II.   Conclusion

The Clerk is **DIRECTED** to enter **FINAL JUDGMENT** in favor of Plaintiff in the amount of **$2,441,336.46** against Defendants, jointly and severally. This amount consists of

- $398,842 in lost profits;

- $20,283.18 in refunds to customers;

- $110,973 in reputational harm;

- $320,943.74 in attorneys' fees and costs of litigation; and

- $1,590,294.54 in punitive damages.

---

[68]   *Id.*

The Clerk is further **DIRECTED** to **CLOSE** this case.

      **SO ORDERED** this the 3rd day of January, 2022.

Steven D. Grimberg
United States District Court Judge